# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CARTER PAGE, | § | |
| | § | No. 79, 2021 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. S20C-07-030 |
| OATH INC., | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: October 13, 2021
Decided: January 19, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting this Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware: **AFFIRMED**.

Sean J. Bellew, Esquire, BELLEW LLC, Wilmington, Delaware, Todd V. McMurtry, Esquire (*argued*), HEMMER DEFRANK WESSELS, PLLC, Ft. Mitchell, Kentucky, and K. Lawson Pedigo, Esquire, MILLER KEFFER & PEDIGO, PLLC, Dallas, Texas, *for Plaintiff Below, Appellant Carter Page.*

T. Brad Davey, Esquire, Jonathan A. Choa, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, Elbert Lin, Esquire, David M. Parker, Esquire (*argued*), HUNTON ANDREWS KURTH LLP, Richmond, Virginia, and Jonathan D. Reichman, Esquire, Jennifer L. Bloom, Esquire, HUNTON ANDREWS KURTH LLP, New York, New York, *for Defendant Below, Appellee Oath Inc.*

**SEITZ**, Chief Justice, for the Majority:

Dr. Carter Page, a public figure with ties to President Trump's 2016 campaign, claimed that Oath Inc.'s online news organizations published eleven defamatory articles about him in 2016 and 2017. Michael Isikoff authored a Yahoo! News article that forms the backbone of the amended complaint (the "Isikoff Article"). Three other articles were written by employees at TheHuffingtonPost.com ("HuffPost") and refer to the Isikoff Article (the "Employee Articles"). The remaining seven articles were written by HuffPost non-employee "contributors" (the "Contributor Articles"). The articles discuss an "intelligence report" from a "well-placed Western intelligence source" with information that Page met with senior Russian officials and discussed potential benefits to Russia if Donald Trump won the presidential election.

The Superior Court granted Oath's motion to dismiss. It found that the Isikoff Articles and Employee Articles were either true or substantially true; Page was at least a limited purpose public figure, meaning he was required to plead actual malice by the individuals responsible for publication, and he failed to meet that standard; the fair report privilege for government proceedings applied; and Oath was protected for the Contributor Articles under the federal Communications Decency Act. Page appeals the Superior Court's judgment except the Superior Court's ruling that the Employee Articles were true.

2

We affirm the Superior Court's judgment. The Isikoff Article describes a federal investigation into a report about Page—an investigation that existed and was being pursued by the FBI. At a minimum, the article is substantially true, and as such, Page did not state a claim for defamation based on that article. Page also fails to state a claim for defamation with respect to the remaining articles. At oral argument, Page conceded that if the Isikoff Article is not defamatory, he loses on his remaining claims. Page also failed to allege that the individuals responsible for publication of those articles acted with actual malice. Finally, Page does not contest the Superior Court's holding that the Employee Articles were true. Because these grounds dispose of Page's defamation claims, we do not address any of the Superior Court's other grounds for dismissal.

## I.

According to the well-pleaded allegations of the amended complaint, which we accept as true for purposes of this appeal, and the documents referred to and relied on in the amended complaint, Dr. Carter Page is an energy consultant who developed contacts in Russia through his work in investment banking.[1] This led him to the attention of former President Donald Trump's campaign. He was brought on as an advisor for Russian affairs in 2016. After this appointment, he was first named

---

[1] Unless otherwise noted, the facts are drawn from the amended complaint and the Superior Court's February 11, 2021 opinion, *Page v. Oath Inc.*, 2021 WL 528472 (Del. Super. Ct. Feb. 11, 2021) (hereinafter "*Page*").

a Trump advisor in March, and then gave at least one extensive interview with a news organization.

Oath Inc. is a technology company that owned several news publications including Yahoo! News and HuffPost. In September 2016, Michael Isikoff published an article about Page in Yahoo! News.[2] The article is entitled "U.S. intel officials probe ties between Trump adviser and Kremlin."[3] It begins by stating that "U.S. intelligence officials are seeking to determine whether [Page] has opened up private communications with senior Russian officials . . . according to multiple sources who have been briefed on the issue."[4] Those sources include "a congressional source" and a "senior U.S. law enforcement official."[5] The article also discusses briefings with "senior members of Congress"—some of whom are named and directly quoted—about Page and Russian efforts to undermine the 2016 election, and how those who were briefed reacted to the information.[6] It then details Page's "extensive business interests" in Russia, as well as statements that were critical of U.S. policy he made both years prior and just before he was brought on as an adviser to the Trump campaign.[7]

---

[2] App. to Opening Br. at A75–A80 (Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, Yahoo! News (Sep. 23, 2016)).
[3] *Id.* at A76.
[4] *Id.*
[5] *Id.* at A77–80.
[6] *Id.* at A76–78.
[7] *Id.* at A78–79.

The Isikoff Article also describes specific "intelligence reports" received by U.S. intelligence agencies that discuss Page's supposed meetings with high-ranking Russian businessmen and officials with close ties to Vladimir Putin.[8]  In the Isikoff Article, the information regarding the report and the receipt of the report by intelligence agencies is credited to "a well-placed Western intelligence source."[9] The article also quotes the congressional source as saying that the "intelligence reports [about Page's ties] . . . were being 'actively monitored and investigated[,]'" and said that a "senior U.S. law enforcement official did not dispute that characterization[.]"[10]  The Isikoff Article does not state that Page met with the individuals named in the report.  Instead, the article states that U.S. officials and U.S. intelligence agencies have received reports that Page met with the Russian businessman and officials.[11]  The article also states the meetings have not been confirmed.[12]

As we now know, Christopher Steele, a former intelligence operative for British Secret Intelligence MI6 and Confidential Human Source for the FBI, created

---

[8] *Id*. at A76–77.

[9] *Id.* at A80.

[10] *Id.* at A77.  The Isikoff Article quotes the official as saying "[i]t's on our radar screen," and "[i]t's being looked at[,]" referring to the intelligence reports of Page's activities.  *Id.*

[11] *Id.* at A79–80 ("But U.S. officials have since received intelligence reports that during that same three-day trip, Page met with Igor Sechin . . . a well-placed Western intelligence source tells Yahoo[!] News.  That meeting, if confirmed, is viewed as especially problematic by U.S. officials . . . .").

[12] *Id.* at A80.

the report. At the time, Steele was running his own private intelligence firm. Steele was hired to investigate then-nominee Trump's ties with Russia. He created a report that included information about Page (the "Steele Dossier" or the "Dossier"). After compiling this information, Steele delivered the Dossier to FBI agents with whom he had a previous relationship as a source.[13] He then told Isikoff that he had delivered the report to the FBI and described the contents of the Steele Dossier.[14] Steele's identity was later released to the public and investigated by the FBI along with the contents of the Dossier.[15]

---

[13] U.S. Office of the Inspector General, Oversight and Review Division 20-012, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation, at v (rev. Dec. 20, 2019), https://www.justice.gov/storage/120919-examination.pdf (hereinafter, the "Inspector General Report"). Page relies heavily on the Inspector General Report throughout his amended complaint. App. to Opening Br. at A8–76 (hereinafter "Am. Compl."). He cites the Inspector General Report to support his factual allegations thirty-six times and quotes the Inspector General Report nineteen times. *Id.* ¶¶ 31; 40; 42; 50; 52; 57; 58 n.35; 69–76; 87; 101; 113. He also makes several other allegations based on the facts from the Inspector General Report. *See generally id*. We consider it a document referred to in the amended complaint that can be considered on a motion to dismiss. *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006) ("Nevertheless, in some instances and for carefully limited purposes, it may be proper for a trial court to decide a motion to dismiss by considering documents referred to in a complaint.").

[14] *Id.* at 5; 104–05.

[15] Our colleague in dissent takes issue with our reliance on the Inspector General Report as outside the record. But the Dissent relies on authority that does not support its position. In *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020), we chose not to rely on a document outside the record because the complaint "did not refer to, quote, or characterize the . . . document at all." As noted above, Page cites to the Inspector General Report throughout his complaint. The Dissent also cites to many articles that were published well after the amended complaint was filed, which is inconsistent with both *Windsor I* and the charge that we judge truth at the time of the publication of the allegedly defamatory article. Dissenting Opinion at 18 n.100; Del. P.J.I. Civ. § 11.12 (2000).

6

Before the Steele Dossier surfaced, in July 2016, the FBI had opened an investigation "into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interefere in the 2016 U.S. presidential election."[16] The FBI opened the investigation, known as Crossfire Hurricane, in response to "information from a Friendly Foreign Government (FFG) reporting that . . . 'the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama).'"[17] A month into this investigation, the FBI opened an individual file on Page and began investigating him directly.[18] Shortly thereafter, the intelligence team considered applying for wiretap authorization under the Foreign Intelligence Surveillance Act ("FISA") to monitor Page, but instead decided it needed more evidence "to support probable cause that Page was an agent of a foreign power."[19]

On September 19, 2016, the Crossfire Hurricane team received the first information from the Steele Dossier and began investigating its claims.[20] The Isikoff

---

[16] Inspector General Report at i. The investigation involved individuals other than Page, though the Inspector General Report focuses mainly on the FISA applications, which were confined to Page. *Id.* at vi.

[17] *Id.* at ii.

[18] *Id.*

[19] *Id.* at iv–v.

[20] *Id.* at v.

Article was then published on September 23, 2016.[21] On October 21, 2016, the FBI filed for and was granted a FISA warrant on Page, and later renewed that warrant three additional times, resulting in eleven months of coverage.[22] While the Steele Dossier "played a central and essential role" in the FBI's decision to seek the FISA warrant, the application for the warrant also cited the Isikoff Article and other information about Page the FBI had gathered.[23]

The details of the Isikoff Article and references to the investigation into Page were reported in ten other articles published on Oath subsidiary sites.[24] The Employee Articles were written by Oath employees at its subsidiary HuffPost. The Contributor Articles were written by "contributors" to HuffPost—unpaid individuals not employed by Oath who were apparently free to post on the website without editorial supervision or prior approval.[25] The authors of these articles were labeled "Contributor" in their bylines, but the presentation of the articles was otherwise substantially similar to those written by employees.[26] Some of these articles refer to

---

[21] App. to Opening Br. at A76.
[22] Inspector General Report at vi.
[23] *Id* at vi; 5.
[24] App. to Opening Br. at A81–A140.
[25] *Id.* at A86–94; A101–40.
[26] *E.g.*, *id.* at A122–27. The articles also have the label "This post was published on the now-closed HuffPost Contributor platform. Contributors control their own work and posted freely to our site. If you need to flag this entry as abusive, send us an email." *E.g., id.* at A123. It seems that the articles did not have this label at the time of publishing, though the format and structure of the posts from contributors is slightly different than those created by employees. *Compare id.* at A107–10 *with id.* at A95–98.

"Yahoo!'s reporting" and Page's involvement with the Senate intelligence committee.[27]

In 2017, Page sued Oath in the United States District Court for the Southern District of New York. Page focused on online articles discussing the federal investigation of Page during Donald Trump's 2016 campaign, including the eleven articles in this case. He raised two claims for defamation and tortious interference under state law and a federal claim alleging international terrorism. Oath successfully moved to dismiss the federal terrorism count, which led to the dismissal of the state law claims on jurisdictional grounds. Relevant to this appeal, the court made several observations about the truth of the statements contained in the Isikoff Article:

> The Article does not say that Plaintiff *actually* met with the two Russians, but rather that U.S. officials had received *reports* of such meetings. The substance and even headline of the Article express uncertainty about the occurrence and substance of any such meetings. That some readers may have assumed that the meetings occurred does not constitute fraud by the Article's publisher. The Complaint also does not dispute that "reports" were received, and instead confirms their existence . . . .[28]

The district court also rejected Page's argument that the Isikoff Article "created a 'deceitful implication that the documents referred to were actual U.S.

---

[27] *Id.* at A83; A96.

[28] *Page v. Oath, Inc.*, 2018 WL 1406621 at *3 (S.D.N.Y. Mar. 20, 2018) (emphasis in original). The Second Circuit affirmed the district court by summary order. *Page v. Oath, Inc.*, 797 F. App'x 550, 554 (2d Cir. 2019).

Government reports'" and observed that "the Article merely states that 'U.S. officials have . . . received intelligence reports[,]'" which the court determined was true.[29]

Page filed suit on July 27, 2020, in the Superior Court and an amended complaint on September 1, 2020.[30] He alleged that Oath had negligently published false and defamatory statements regarding Page with actual knowledge of their falsity or a reckless disregard for the truth or falsity of the statements.[31] Page alleged generally that the Isikoff Article was "replete with false and defamatory statements about [Page]."[32] He specifically claimed the article merely repeated allegations from the report that he had met with high-ranking Russian individuals,[33] but he also disputed the description of Steele as "a well-placed Western intelligence source,"[34] and the description of the Steele Dossier as an "intelligence report."[35] Page alleged that the articles, especially the Isikoff Article, were meant to convey the sense that

---

[29] Id.

[30] Page, 2021 WL 528472, at *2. Page has also filed and lost similar lawsuits on other reporting about his ties to Russia. Page v. Democratic National Committee, 2020 WL 8125551 (N.D.Ill. Aug. 17, 2020) aff'd, 2 F.4th 630 (7th Cir. 2021); Page v. Democratic National Committee, 2019 WL 404986 (W.D.Okla. January 31, 2019).

[31] Page also claimed "tortious interference with prospective business relationships," though this was apparently not pursued in the Superior Court, and is not appealed here. Am. Compl. at 1, ¶¶ 121–25; 158–63.

[32] Id. ¶ 4.

[33] "Defendant made numerous false statements including without limitation the following: Dr. Page met with Sechin; Dr. Page met with Diveykin; Dr. Page met with the Kremlin; and a well-placed Western intelligence source confirmed that Dr. Page met with Sechin and Diveykin." Id. ¶ 144.

[34] Id. ¶¶ 98–99.

[35] Id. ¶ 34.

the report was from a "high-level government employee in a three-letter [government] agency," rather than an intelligence "source" who merely provided information.[36] But Page did not dispute other parts of the article, including the description of briefings with senior members of Congress about his connection to Russian officials, quotes from members of Congress, quotes from law enforcement officials, or the lengthy description of Page's "extensive business interests" in Russia. Nor did Page dispute or mention the sections of the Isikoff Article discussing his prior statements regarding U.S. policy decisions about Russia.

With respect to actual malice, Page claimed that "Isikoff and Yahoo! failed to perform any form of investigation into the veracity of the article,"[37] and that Yahoo! and Oath were motivated by financial gain in publishing defamatory statements.[38] He also discussed the role of Fusion GPS, a strategic intelligence firm involved in creating the intelligence report that underlies the articles, and the background of Tim Armstrong, the former CEO of Oath, as a Hillary Clinton supporter.[39]

Oath filed a motion to dismiss the amended complaint.[40] Oath argued that the Isikoff Article's statements were "literally true, or, at a minimum, substantially true," or were protected under the privilege for "fair reports" of government

---

[36] *Id.* ¶ 87.
[37] *Id.* ¶ 85.
[38] *Id.* ¶¶ 89–90.
[39] *Id.* ¶ 116.
[40] App. to Opening Br. at A142–44.

proceedings; and with respect to the other articles; Oath was not the proper defendant; Page had failed to plead actual malice; and Oath was immune from suit regarding the Contributor Articles under 47 U.S.C. § 230.[41] Oath argued that "[a]ll the article [said] is that U.S. intelligence agencies were investigating 'reports' of his meetings with Russian officials, which Page admits is true."[42] With respect to actual malice, Oath contended that Page had at most argued that Isikoff and Oath's former CEO had actual malice, not the authors of the Employee Articles and Contributor Articles—and that the arguments for actual malice against Isikoff and Oath were legally deficient.

The Superior Court granted Oath's motion to dismiss. Preliminarily, the Superior Court held that Page was at least a limited public figure based on his role as part of candidate Trump's advisory team and was required to demonstrate actual malice on the part of the "the persons . . . having responsibility for the [allegedly defamatory] publication," rather than an organization.[43]

The court then determined that "nothing in the Complaint [supported] Plaintiff's claims that these statements in the Isikoff Article were false" because the Isikoff Article "simply says that U.S. intelligence agencies were investigating

---

[41] *Id*. at A142.
[42] *Id*. at A154.
[43] *Page*, 2021 WL 528472, at *5 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964) (alteration in original)).

12

reports of Plaintiff's meetings with Russian officials, which Plaintiff admits is true . . . ."[44] The court disagreed that the terms "intelligence report" and "well-placed Western intelligence source" would lead a reasonable person to conclude that the report mentioned in the Isikoff Article was from a government agency.[45] Moreover, the "gist" of the Isikoff Article was that "the U.S. government was investigating possible meetings between [Page] and Russian officials."[46] Because the article was true, or at least substantially true, the Superior Court held any minor incorrect statements in the article were irrelevant.[47] The court also held that the Isikoff Article was protected under the privilege for "'fair and accurate' reports of 'governmental' proceedings."[48]

As for the Employee and Contributor Articles, the Superior Court ruled that Page's defamation claims failed because he had not pleaded actual malice as to any of the authors, the Employee Articles were true, and Oath was immune from liability under the federal Communications Decency Act for the Contributor Articles.[49] In the court's view, Page's allegations of actual malice were confined to Isikoff, Yahoo!, and Oath, through its former CEO.[50] As such, he had not demonstrated

---

[44] *Id.*; *see generally* Inspector General Report.
[45] *Id.* at *3.
[46] *Id.*
[47] *Id.* (citing *Gannett Co. v. Re*, 496 A.2d 553, 557 (Del. 1985)).
[48] *Id.* at *4 (citing *Read v. News-Journal Co.*, 474 A.2d 119, 120 (Del. 1984)).
[49] *Id.* at *7–8.
[50] *Id.*

actual malice—and his allegations as to the Isikoff Article's failure to fact-check were insufficient to establish reckless disregard.[51]

The Superior Court then held that the Employee Articles were true or substantially true in that they repeated the statements in the Isikoff Article or merely referenced Page in ways Page did not dispute—for example, "Members of Congress have been briefed on Page discussing sanctions relief with Russia, Yahoo[!] News reported Friday."[52] Finally, as to the Contributor Articles, the court held that HuffPost was immune from suit under the federal Communications Decency Act.[53]

Page timely appealed the Superior Court's decision to this Court.

II.

We review the Superior Court's grant of a motion to dismiss under a *de novo* standard of review and apply the same standard as the trial court.[54] When reviewing a Rule 12(b)(6) motion, "a trial court must accept as true all of the well-pleaded allegations of fact,"[55] but is not "required to accept as true conclusory allegations

---

[51] *Id.* (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).

[52] *Id.* at *5–6; App. to Opening Br. at A82. One article only referenced Page in one sentence and made no reference to the Isikoff Article: it said Page was "so far refusing to cooperate" with document requests from the Senate Intelligence Committee. *Id.* at A96. The Superior Court held that Page had pleaded no facts that showed he had cooperated at the time the article was published and that contrary to his assertions, a reasonable person would not conclude Page "was 'obstructing a congressional investigation.'" *Page*, 2021 WL 528472, at *6 (citing Am. Compl. ¶ 54). Another article said then-nominee Trump had "denounce[d] his ties" to Page. As the Trump campaign had cut ties with Page, and Page admitted "'he was unable to contribute any material assistance' to the Trump campaign[,]" the court held the third article was also true. *Id.*

[53] *Page*, 2021 WL 528472, at *6–7 (citing 47 U.S.C. § 230(c)(1)).

[54] *Difebo v. Bd. of Adjustment of New Castle Cnty.*, 132 A.3d 1154, 1156 (Del. 2016).

[55] *In re Gen Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

14

'without specific supporting factual allegations.'"[56]  Rule 12(b)(6) motions are generally confined to the facts alleged in the complaint.[57]  "Moreover, a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'"[58]  Also, "in some instances and for carefully limited purposes, it may be proper for a trial court to decide a motion to dismiss by considering documents referred to in a complaint."[59]

## A.

To state a claim for defamation under Delaware law, the plaintiff "must plead and ultimately prove that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory."[60]  If the plaintiff is a public figure, even for a limited purpose, "the public figure defamation plaintiff must [also] plead and prove that 5) the statement is false and 6) that the defendant made the statement with actual malice."[61]

---

[56] *Id.* (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).
[57] *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993).
[58] *In re Gen Motors (Hughes) S'holder Litig.*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)).
[59] *Id.* at 169 (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d at 69).  We are, however, hesitant to consider documents not referenced in pleadings or included in a complaint.  *Windsor I, LLC*, 238 A.3d at 875 (stating that we will not rely on a document not in the record because the complaint "did not refer to, quote, or characterize the [extrinsic] document at all.").
[60] *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).
[61] *Id.*

The elements of a defamation claim brought in Delaware by a public figure have roots in the seminal case *New York Times, Inc. v. Sullivan*.[62]  In *Sullivan*, the Supreme Court held that the United States Constitution requires public officials who bring defamation claims related to official conduct to show that the allegedly defamatory statement was made with actual malice.[63]  The Court extended this high bar to public figures in *Curtis Publishing Co. v. Butts*,[64] and to what are generally known as limited purpose public figures in *Gertz v. Robert Welch*.[65]  A person becomes a limited purpose public figure when he "voluntarily injects himself or is drawn into a particular public controversy[.]"[66]

Following *Sullivan*, there was a lack of clarity about who had the burden of proving falsity in defamation cases—the plaintiff or the defendant.  At common law, truth was an affirmative defense, and the defendant had the burden of proving the truth of the statement.[67]  But *Sullivan* seemed to require the opposite.[68]  The U.S. Supreme Court settled this issue in *Philadelphia Newspapers, Inc. v. Hepps*, when

---

[62] 376 U.S. 254, 287 (1964).

[63] *Id.* at 279–280 ("The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.").

[64] 388 U.S. 130 (1967) (holding that a college athletic director was a public figure and therefore required to show falsity and actual malice in a defamation claim under *Sullivan*).

[65] 418 U.S. 323 (1974).

[66] *Id.* at 351.

[67] Rodney A. Smolla, *Law of Defamation* §§ 5:2–5:3 (2d ed. 2021).

[68] 376 U.S. at 279–80.

it held that the plaintiff, whether a public official, public figure, or private individual, has the burden of proving the allegedly defamatory statement is false when the defendant is a media source.[69] The Court explained that such a requirement served the consitutitional commitment to freedom of the press, ensured media outlets and similar defendants would not be saddled with unwarranted liability, and encouraged public debate and discussion on important public issues.[70]

Delaware common law also held that truth is an affirmative defense to a defamation action.[71] But in response to the Supreme Court's defamation jurisprudence, we have since said that a public figure plaintiff must prove the alleged defamatory statement is false.[72] Additionally, truth as an affirmative defense allowed for the defense of "substantial truth[,]" including whether the "gist" or "string" of the article is true if it produces the same impression on the reader which the precise truth would have.[73] The question then arose whether the public figure plaintiff, in proving falsity, must go beyond establishing that the statement is not literally true and also prove that the statement is not substantially true. The Superior

---

[69] 475 U.S. 767, 775 (1986) ("[A]s one might expect given the language of the Court in [*Sullivan*] . . . [the] plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation.").
[70] *Id.*
[71] *Barker v. Huang*, 610 A.2d 1341, 1350 (Del. 1992).
[72] *Cahill*, 884 A.2d at 463 (citing *Hepps*, 475 U.S. at 777).
[73] *Re*, 496 A.2d at 557 (citing *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D. Pa. 1983); Prosser on Torts § 116 at 798 (4th ed. 1971)). *See also Williams*, 555 F. Supp. at 202 ("if the statement is true in substance inaccuracies of expression or detail are immaterial.").

Court first held in *Ramada Inns, Inc. v. Dow Jones & Co.* that the substantial truth standard from common law should apply in the other direction as well, meaning a public figure plaintiff must negate substantial truth.[74] Delaware trial courts have since adhered to this approach.[75]

The United States Supreme Court has approved of this reasoning.[76] In *Masson v. New Yorker Magazine, Inc.*, the Court confronted whether a magazine's slight alteration of a quotation of the plaintiff constituted "knowledge of falsity" and satisfied the actual malice standard.[77] It held that the historical common law concept of substantial truth applies even though the burden is on the plaintiff, because the "essence of that inquiry . . . remains the same[.]"[78] The plaintiff had to show that the altered quotation was not *substantially true* to prove that the magazine published the altered quotation with knowledge that it was false.[79] Thus, a public figure plaintiff must also show that a statement is not substantially true under the "falsity" and malice prongs of the defamation test.

---

[74] 543 A.2d 313, 318 (Del. Super. 1987).

[75] *See, e.g.*, *Owens v. Lead Stories, LLC*, 2021 WL 3076686 at *12 (Del. Super. July 20, 2021); *Agar v. Judy*, 151 A.3d 456, 486 (Del. Ch. 2017); *Martin v. Widener University School of Law*, 1992 WL 153540 at *10 (Del. Super. June 4, 1992).

[76] *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991); *see also Smith v. Cuban American Nat. Foundation*, 731 So.2d 702, 706–08 (Fla. Dist. Ct. App. 1999).

[77] *Id.* at 513.

[78] *Id.* at 516–17.

[79] *Id.*

We evaluate substantial truth by looking at "whether the 'gist' or 'sting' of the statement is true."[80] "The gist or sting of the statement is true 'if it produces the same effect on the mind of the recipient which the precise truth would have produced.'"[81] When deciding whether a statement is substantially true, we compare the "effect of the alleged libel versus the effect of the precise truth on the mind of the recipient or average reader[,]" and see if the effect is the same.[82]

In addition to proving that the statement is false or not substantially true, the public figure defamation plaintiff must also prove that the statement was made with actual malice.[83] Actual malice requires "knowledge that [the statement] was false or with reckless disregard of whether it was false or not."[84] In a case where the defendant is an institution, the state of mind must be "brought home" to the person or persons in the "organization having responsibility for the publication . . . ."[85] The

---

[80] *Ramada Inns, Inc.*, 543 A.2d at 317 (citing *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987)).
[81] *Id.* at 317–18 (quoting *Riley*, 543 A.2d at 253).
[82] *Id.* at 318.
[83] *Cahill*, 884 A.2d at 463.
[84] *Agar*, 151 A.3d at 477 (citing *Cahill*, 884 A.2d at 463); *see also Sullivan*, 374 U.S. at 279–80. This also can be indicated by a "fail[ure] to make any effort to" interview a key witness or "purposefully avoid the truth." *Harte-Hanks Commc'ns, Inc*, 441 U.S. at 692.
[85] *Sullivan*, 376 U.S. at 287; *see also Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 225 (6th Cir. 1995) ("where, as here, the defendant is an institution rather than an individual, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind." (citing *Sullivan*, 376 U.S. at 287)); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." (citing *Sullivan*, 376 U.S. at 287)).

substantial truth of the statement bears on whether the person responsible for publishing the statement had actual malice.

B.

1.

Page does not dispute that he was a limited purpose public figure, requiring him to show the statements in the articles were false or not substantially true, and made with actual malice.[86] Page's main argument on appeal is that, although the statements in the Isikoff Article might be technically true as written, Isikoff nonetheless defamed Page by "couching" or "qualifying" descriptions of the investigation and the Steele Dossier within the Isikoff Article. For example, Page claims that he did not meet with Russian officials or businessmen about the Trump campaign.[87] He argues that the Isikoff Article's statements about the Steele Dossier essentially reported that the meetings occurred.[88] Even though the Superior Court found that the Isikoff Article "simply says that U.S. intelligence agencies were investigating reports of [Page's] meetings with Russian officials,"[89] Page argues

---

[86] *Page*, 2021 WL 528472, at *4; Opening Br. at 26.

[87] Opening Br. at 35 ("In short, there is no dispute that Carter Page did not hold a meeting, surreptitious or otherwise, with Russian agents.").

[88] *Id.* at 41 ("Yet, as usual, Isikoff hides behind barely qualifying language, terming the charge an allegation[.]").

[89] *Page*, 2021 WL 528472, at *3; *see also* Inspector General Report. Page's complaint admits that U.S. intelligence agencies investigated Page. Am. Compl. ¶¶ 11; 41; 63.

that the Isikoff Article conveys a "false gist"—namely, that Page was colluding with Russian officials.[90]

Page also argues that the Isikoff Article conveyed that there was an "ongoing and serious federal investigation, instead of a contrived set-up in which the reporter himself played a part."[91] In Page's view, the Isikoff Article's statements that "intelligence officials [were] seeking to determine" whether allegations in the Steele Dossier were true and that the allegations had been "discussed with senior members of Congress during recent briefings" conveyed a "false gist"—that there was a serious federal investigation into Page.[92] He further disputes the characterization of Steele as a "well-placed Western intelligence source" and the Steele Dossier as an "intelligence report,"[93] instead referring to the information as "the Steele fabrications."[94] There was no serious federal investigation at the time of the Isikoff Article, Page says, because it was the Isikoff Article that led the FBI to open its investigation.

Oath responds that the Isikoff Article was true, or at least substantially true. Oath argues that the Isikoff Article never stated that Page met with Russian officials. Many parts of the Isikoff Article, according to Oath, "express uncertainty about the

---

[90] Opening Br. at 26.
[91] *Id.* at 38.
[92] *Id.* at 36; 39 (citing A76–80).
[93] *Id.* at 12 ("Page was not the subject of an 'intelligence report'; no 'intelligence report' had been filed with the FBI"); *id.* at 32; 39–41; Reply Br. at 18–19.
[94] *Id.* at 36–37; 39.

occurrence and substance of any such meetings[,]"[95] contradicting Page's argument that the article made allegations about the truth of the Dossier itself. And Oath argues that Page concedes that "officials *did* receive reports that he had met with the Russians."[96] As to whether the descriptions "intelligence report" and "well-placed Western intelligence source" were false, Oath points out that the Isikoff Article specifically said that intelligence agencies and federal officials had "*received* [the reports], not *issued* [] them."[97] In Oath's view, an intelligence report "is simply a report of information potentially relevant to an investigation[,]" and the Superior Court correctly found that Steele was a "well-placed Western intelligence source."[98] Finally, Oath argues that any falsity in these descriptions is immaterial because, as the Superior Court found, the "gist" of the statement was what mattered—and the gist of the Isikoff Article was the existence of a U.S. intelligence investigation into Page and his contacts with Russian officials.

Although Page and our Colleague in Dissent would have us go behind what was published and credit an alleged conspiracy between Isikoff, Steele, and others, the question before us is whether Page pleaded the Isikoff Article is false. If it is not false, Isikoff could not have known it was false or had "a high degree

---

[95] Answering Br. at 32–33 (citing *Page*, 2018 WL 1406621 at *3).
[96] *Id.* at 33 (citing Am. Compl. ¶ 34) (describing "reports submitted by Steele"); Opening Br. at 36 (admitting that the Steele Dossier was sent to the FBI); *id.* at 39 (admitting that the Steele Dossier was "transmitted . . . to Democratic leaders in Congress")).
[97] *Id.*
[98] *Id.* at 33–34.

of . . . awareness of probable falsity."[99]  It is also not our role to determine whether the information in the Steele Dossier is true or false.  Rather, our job is to ask whether Page has properly alleged that what was written in the Isikoff Article is false or not substantially true.

We agree with the observations of the federal court in New York and the Superior Court that the Isikoff Article is true or subtantially true.  The headline of the article is "U.S. intel officials probe ties between Trump adviser and Kremlin," and the rest of the article contains substantially similar language referring to an investigation.[100]  The Isikoff Article describes a multi-pronged investigation, with various individuals confirming the investigation and expressing their concern.  Far from being a mere republication of libelous matter, these are true statements.  U.S. intelligence agencies had received intelligence reports, and they were investigating the allegations in those reports.[101]  Page argues that Isikoff was merely "couching [the] statement[s] in terms of qualification[.]"[102]  But as the Superior Court found, the Isikoff Article makes clear that these allegations were unsubstantiated and under

---

[99] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688 (citation omitted).  With respect to any "reckless disregard" as to whether or not the statements of fact were true, the Isikoff Article itself indicates that Isikoff investigated whether an investigation was occurring by speaking to congressional sources and "a senior U.S. law enforcement official."  App. to Opening Br. at A76–A77.  Additionally, as Page concedes, Isikoff attempted to reach him for comment twice, far from a "reckless disregard" for what Page had to say.  *Id.* at A44–45 (Am. Compl. ¶¶ 82–83).
[100] App. to Opening Br. at A76.
[101] Inspector General Report, at vi.
[102] Opening Br. at 38.

investigation—using phrases such as "seeking to determine;" "[t]hat meeting, if confirmed;" and "[a]t their alleged meeting."[103] U.S. officials had in fact received these reports and were investigating them, and as such, the article was true—even if the Steele Dossier was later found to be false.[104]

And the gist of the article is that there was a serious federal investigation into Page, which is also true. The Steele Dossier was being investigated by federal intelligence officials and was known to members of Congress. These details are confirmed by the Inspector General Report.[105] The Inspector General Report also confirms that the investigation into Page was opened in August 2016.[106] It was opened not in response to the Isikoff Article or even the Steele Dossier, but after "an initial analysis of links between Trump campaign members and Russia."[107] With respect to the Steele Dossier, the reviewing team "determined that the Crossfire Hurricane team's receipt of Steele's election reporting on September 19, 2016 played a central and essential role in the FBI's and Department [of Justice]'s decision to seek the FISA order [into Page]."[108] This shows that there was already a "serious

---

[103] *Page*, 2021 WL 528472, at *3; App. to Opening Br. at A76–80 (the Isikoff Article).

[104] We judge the truth of the allegations in an article at the time they were published, not with the benefit of hindsight. Restatement, Torts 2d, § 581A, comment (g) ("The truth of a defamatory imputation of fact must be determined as of the time of the defamatory publication."). *See also* Del. P.J.I. Civ. § 11.12 (2000) ("It is an absolute defense to a claim of defamation that the alleged defamatory statements were substantially true at the time the statements were made.").

[105] Inspector General Report, at ii; 322.

[106] *Id.* at ii; 59.

[107] *Id.* at ii.

[108] *Id.* at vi.

federal investigation" into Page and his contacts with Russian officials at the time the Isikoff Article was written—and that the Steele Dossier was a part of that investigation.

Additionally, the Inspector General later investigated Steele's credentials and the FBI decision to accept the Steele Dossier.[109] The Inspector General determined that Steele had been a "Confidential Human Source" or "CHS" to the FBI since 2013, and had provided "helpful information to the FBI in the past."[110] While Page may dispute the description of Steele as a "well-placed Western intelligence source," Steele was, in fact, providing information to Western intelligence agencies and was "well-placed" to tell Isikoff about who had received the intelligence report—given that he had supplied his report to those parties.

At bottom, the point of the Isikoff Article is that there was a substantial federal investigation into Page and the Trump campaign's Russian ties. This is true. The Isikoff Article describes the existence of the Steele Dossier, that it was provided by an intelligence source, and how it was being investigated by U.S. intelligence agencies. This is also true. Page fails to plead that any of these details are false. At the very least, the Isikoff Article is substantially true because the gist of the article reflected the title of the article. U.S. intelligence officials were investigating Page's

---

[109] *See generally id.*
[110] *Id.* at v–vi.

ties with Russia,[111] they had received the Steele Dossier from Steele,[112] a former MI6 intelligence operative who supplied information to Western intelligence agencies, including the FBI,[113] and U.S. intelligence agencies were investigating the allegations in the Steele Dossier.[114]

Page and our Colleague in Dissent argue that the phrase "intelligence report" was misleading. They argue "intelligence report" implies that the reports came from a U.S. intelligence agency, making the whole article substantially false. We disagree. These two words do not change the overall gist of the multi-page article and its true statements. And the phrase itself was not misleading. First, adding "intelligence" to "report" is a description of the type of report, not a determination of its origin. Just as agencies receive "intelligence" on given matters, they may also receive this intelligence compiled into reports—especially from Confidential Human Sources like Steele. Second, the Isikoff Article specifically states that the intelligence agencies are "monitor[ing] and investigat[ing]" the reports, and that a Congressional leader asked the FBI to investigate Page's Russian ties.[115] The references to the intelligence report indicate that it was still being investigated and was not a fully-formed government report.

---

[111] *Id.* at ii; 59–60.
[112] *Id.* at v.
[113] *Id.*
[114] *Id.* at vi.
[115] App. to Opening Br. at A76–77.

Finally, our Colleague in Dissent questions our treatment of Page's collusion theory.[116] Page's conclusory allegations of collusion and conspiracy, however, have no bearing on the truth or substantial truth of the Isikoff Article—which is the focus of this case and our analysis.[117] Page's allegations, even taken as true, speak to potential malice, not truth.[118]

And these allegations of a conspiracy must be cribbed together from conclusory connections among the parties involved. Page alleges 1) Oath's former CEO had ties to the Democratic party and Hillary Clinton;[119] 2) the CEO of Fusion GPS—Glenn Simpson—and Isikoff were friends;[120] 3) the Democratic National Committee ("DNC") hired the law firm Perkins Coie LLP;[121] 4) Perkins Coie and the DNC hired Fusion GPS "to develop negative information that could be used to allege then-candidate Trump and his campaign had ties to Russia[;]"[122] and 5)

---

[116] Dissenting Opinion at 13–20.

[117] These allegations may have some relevance to whether Isikoff acted with actual malice and is apparently why Page raises it in Section V of his complaint: "Defendant Acted with Malice Defaming Dr. Page[.]" Additionally, many of the allegations that make up Page's collusion theory are conclusory in nature and have no supporting factual allegations, meaning they are not well-pleaded.

[118] Page also alleges malice on the grounds that Oath was financially motivated by "clicks." Opening Br. at 31 (citing Am. Compl. ¶ 2). But "[i]f a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels." *Harte-Hanks Commc'ns.*, 491 U.S. at 667.

[119] Opening Br. at 31 (citing Am. Compl. ¶ 10).

[120] Am. Compl. ¶ 6.

[121] *Id.* ¶ 5; 65.

[122] *Id.* ¶ 65.

Fusion GPS hired Steele to investigate then-nominee Trump and his ties to Russia.[123]

None of Page's allegations regarding conspiracy speak to Isikoff's motivation. The closest this "conspiracy" gets to Isikoff is that Isikoff was friends with Simpson, who may have been part of it. Page therefore implies a conspiracy—and then fails to ascribe the malice of the conspiracy to Isikoff.

As noted earlier, none of this—even taken as true—has any bearing on the truth or substantial truth of the Isikoff Article. Page was being investigated by U.S. intelligence officials, the Steele Dossier was a part of that investigation, and Steele, a former intelligence operative and confidential source, had provided the Steele Dossier to the FBI. These are the facts—referenced by Page in his own amended complaint and confirmed by the Inspector General Report, also relied on extensively in the amended complaint. Page's collusion theory does not change the fact that the Isikoff Article is true or substantially true.

2.

We turn next to Page's defamation claims based on the ten other articles—the Employee Articles and the Contributor Articles. Page agreed at oral argument that

---

[123] *Id.* ¶ 69. Page admits that Steele said the report was uncorroborated, which further undermines his theory of a broad conspiracy to create negative information that could be used against the Trump campaign. *Id.* ¶ 73 ("[E]ven Steele, with whom Isikoff had direct access, described these reports as 'uncorroborated,' not designed to be finished products, and not to be consumed as 'written product[s].'" (quoting Inspector General Report at 94) (alteration in original)).

if the Isikoff Article is not defamatory, he loses.[124] Because we have already concluded that the Isikoff Article is true or substantially true, Page's claims as to the other articles fail.

Regardless, Page has also failed to state a claim for the Employee Articles and Contributor Articles because he did not allege that any of the individuals responsible for their publication acted with actual malice.[125] Page admits that the amended complaint does not allege that the authors of the Employee Articles and Contributor Articles acted with actual malice.[126] Page claims instead that he did not need to allege that the authors of the Employee Articles and Contributor Articles acted with actual malice because he had alleged that Oath and Isikoff acted with actual malice, and that malice can be imputed to the other authors.[127]

Oath responds that Page had to plead that the person or persons responsible for the articles—the author or editors of these articles—acted with actual malice.[128] According to Oath, "organizations cannot have institutional knowledge of falsity"

---

[124] At oral argument, defense counsel was asked "[i]f we were then to determine that the Isikoff article was not defamatory, does your client lose?" and defense counsel responded, "yes." Oral Argument at 13:30–13:40.

[125] Additionally, as mentioned above, Page does not contest the Superior Court's finding that the Employee Articles were true, and so waives his defamation argument with respect to those articles. *Murphy v. State*, 632 A.2d 1150, 1152 (Del 1993).

[126] Opening Br. at 27–29 (stating that "[the Amended Complaint] does not allege that the freelance journalists who wrote the [Contributor Articles], as independent contractors, themselves acted with actual malice, . . . [it] alleges that it was Oath who controlled the article of Isikoff, its employee, whose conclusions were then the basis for the defamatory statements in the [Contributor Articles]."); Reply Br. at 10–12; 15; *see also* Oral Argument at 12:24–13:30.

[127] Opening Br. at 27–29; Reply Br. at 10–14.

[128] Answering Br. at 24; *see also* App. to Opening Br. at A274–75.

because the responsibility lies with the person or persons responsible for the defamatory statements.[129] Oath cites federal cases in support of the proposition that the "author" or "speaker" of the publication is generally one of the people responsible for its publication.[130]

First, we note that the truth or substantial truth of the Isikoff Article negates any defamation claims in the Contributor Articles. This is because, to the extent that the Contributor Articles accurately recount what Isikoff reported in the Yahoo! Article, they, too, are true or substantially true. And to the extent that they stray from the Isikoff Article's subject matter, the statements in the Contributor Articles are not actionable absent an allegation that those responsible for the statements—in this case at least the authors of the articles—acted with actual malice. Page mistakenly takes the word "publish[er]" in *Sullivan* literally—when in *Sullivan* and elsewhere, "publish[er]" simply means those involved in drafting the alleged defamatory statement.[131]

In *Sullivan*, the New York Times was not held liable for defamatory statements under a theory of institutional knowledge when the false information in

---

[129] *Id.*

[130] *Id.* at 26–27 (first citing *Palin v. New York Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) ("Because the Times identified Bennet as the author of the editorial, it was his state of mind that was relevant to the actual malice determination."); then citing *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1084 (9th Cir. 2002)).

[131] *Dongguk Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("[T]he plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." (citing *Sullivan*, 376 U.S. at 287)).

an advertisement was contradicted by prior New York Times articles.[132]  The Court

held that "the state of mind required for actual malice [must] be brought home to the

persons in the . . . organization having responsibility for the publication . . . ."[133]  In

other words, the state of mind of the individuals actually involved in approving the

publication was relevant to actual malice—not the Times (the newspaper publisher)

as a whole.[134]  The cases Page relies on do not suggest otherwise—rather than being

cases where a newspaper publisher is held directly liable for its own "malice," these

are situations where the author or editor of the defamatory statement is found to have

acted with actual malice and then the publisher's liability is examined under

vicarious liability principles.[135]

---

[132] *Sullivan*, 376 U.S. at 287.
[133] *Id*.
[134] *Id*.
[135] *DARE v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1278–80 (C.D. Cal. 2000) (finding a magazine publisher was not vicariously liable for the actual malice of an independent contractor); *Chaiken v. Village Voice Publishing Corp.*, 119 F.3d 1018, 1033–34 (2nd Cir. 1997) (finding a newspaper publisher was not vicariously liable for the actual malice of an independent contractor); *see also Genesis Intern. Holdings v. Northrop Grumman Corp.*, 238 F. App'x 799, 802 (3rd Cir. 2007) (finding a complaint adequately alleged that the defendant corporation was vicariously liable for a defamatory statement made by its employees); *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 47–48 (N.J. 1989) ("[Defendants] could be held liable under *respondeat superior* principles if their employees defamed plaintiffs.")).  Our Colleague in Dissent argues that Page could properly allege actual malice as to Oath *through* its employee Isikoff, and cites *Sharon v. Time, Inc.*, 599 F. Supp. 538, 564 (S.D.N.Y. 1984) as support.  *Sharon* states that a "plaintiff may prove the actual malice of a press defendant by relying on the acts of all of the defendant's employees performed within the scope of their employment."  *Id.* (citing *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253 (1974)).  But *Cantrell*, the foundation of the *Sharon* court's claim, simply holds, as do the cases cited above, that an employer can be held liable for its employee's defamation under respondeat superior.  *Cantrell*, 419 U.S. at 253 ("However, these [sic] was sufficient evidence for the jury to find that [employee's] writing of the feature was within the scope of his employment at the [employer] and that [employer] was therefore liable under

31

*Sullivan* is clear that defamation claims by a public figure require a showing that those responsible for the publication of defamatory content must have acted with actual malice.[136]  Page must plead that the individuals responsible for publishing the Employee Articles and Contributor Articles acted with actual malice.  He admits he has not done so.  Thus, he has failed to state a claim for defamation based on those articles.

## III.

We affirm the Superior Court's dismissal of the amended complaint.

---

traditional doctrines of respondeat superior.").  Page cannot allege actual malice as to Oath alone, he must allege that the individuals at Oath responsible for publishing the alleged defamation acted with actual malice, and then Oath can be held vicariously liable for the actions of its employees.
[136] 376 U.S. at 287.

**VALIHURA, J.**, dissenting:

Freedom of speech is a cornerstone of the foundation of American liberty.[1] The free interchange of ideas on the most important political topics of the day is what breathes life into this most essential freedom.[2] Squelching, or chilling unpopular political points of view can erode that foundation. Thus, that cornerstone must bear the brunt of harsh, mean-spirited, and perhaps even some false political speech in order to support our nation's commitment to free expression of divergent points of view on the most critical, and potentially divisive issues of the day.[3]

That free speech is so essential to our nation's lifeblood necessitates that a certain amount of error in the spoken or written word be tolerated. James Madison once said that

---

[1] *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2318 (2019) (Sotomayor, J., concurring in part, joined by Breyer, J.) (articulating that "[f]reedom of speech is a cornerstone of our society"); *Kelly v. U.S. Postal Serv.*, 492 F. Supp. 121, 131 (S.D. Ohio 1980) ("The First Amendment's guarantee of freedom of speech is a cornerstone of our system of government."); *see also* Randy J. Holland, *The Delaware State Constitution* 86 (2d ed. 2017) ("Cornerstones of the American legal system include the right to free speech, to assembly, to petition the government for grievances, and to be free from criminal interference.").

[2] *See Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("Political speech, of course, is 'at the core of what the First Amendment is designed to protect.'") (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality opinion)); *Cox v. State of Louisiana*, 379 U.S. 536, 552 (1965) ("[M]aintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.").

[3] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."); *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 556 (1980) ("The freedoms of speech, press, and assembly, expressly guaranteed by the First Amendment, share a common core purpose of assuring freedom of communication on matters relating to the functioning of government."); *id.* at 587 (Brennan, J., concurring, joined by Marshall, J.) ("[T]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government.") (emphasis omitted).

"[s]ome degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press."[4]  As our United States Supreme Court has stated, "erroneous statement[s are] inevitable in free debate," and they must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive."[5]  Thus, authors of statements critical of public officials are afforded latitude so that public debate and speech is not chilled.

The boundaries of that latitude were carefully crafted by the United States Supreme Court in the rule articulated in *New York Times v. Sullivan*,[6] specifically, that a public official cannot recover damages for a defamatory falsehood relating to his official conduct "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[7] Although there is latitude, the speaker or writer does not have unfettered and unconditional carte blanche to publish false statements about public figures.[8]

---

[4] 4 Elliot's Debates on the Federal Constitution 571 (1876); *see also Time, Inc. v. Pape*, 401 U.S. 279, 292 (1971) ("[I]t is essential that the First Amendment protect some erroneous publications as well as true ones.") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1986)).

[5] *Sullivan*, 376 U.S. at 271–72; *see NAACP v. Button*, 371 U.S. 415, 433 (1963).

[6] *Sullivan*, 376 U.S. 254.

[7] *Id*. at 279–80.

[8] The existence of this boundary line is made clear as concurring Justice Black voted to reverse the half-million-dollar judgment against the New York Times Company "exclusively on the ground that the Times and the individual defendants had an absolute, unconditional constitutional right to publish in the Times advertisement their criticisms of the Montgomery agencies and officials."  *Id.* at 293 (Black, J. concurring, joined by Douglas, J.).  Such an unconditional formulation of the free speech right was not adopted by the Majority.

But as the United States Supreme Court has recognized, "there is also another side to the equation; we have regularly acknowledged the 'important social values which underlie the law of defamation.'"[9] "Society has a pervasive and strong interest in preventing and redressing attacks upon reputation."[10] This Court, for example, has recognized that "the protection afforded to reputations by the Delaware Constitution weighs heavily in the balance of the analysis involving constitutionally protected speech."[11] As one noted scholar has observed, "[a]lthough the best cure for 'bad' speech is counterspeech, contemporary American society is simply not willing to let corrective speech act as the only restraint on media power; the law of defamation is one of the few tether lines on the press, which has emerged as an American institution with enormous influence."[12]

---

[9] *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1996)).

[10] *Rosenblatt*, 383 U.S. at 86.

[11] *Kanaga v. Gannett Co.*, 687 A.2d 173, 177 (Del. 1996). Although the parties did not discuss the Delaware Constitution or raise it as the basis of any claim or defense, the Delaware Freedom of the Press provision in Article I, Section 5 "has been interpreted as having the same scope as the First Amendment to the United States Constitution." Holland, *supra* note 1, at 49 (citing *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 632 (D. Del. 2007) (regarding post-2003 Amendment to Article I, Section 5, "the free press provision of the Delaware Constitution has the same scope as the First Amendment [of the United States Constitution]")); *In re Opinion of the Justices*, 324 A.2d 211, 213 (Del. 1974) (regarding the pre-2003 Amendment landscape, "it is probable that the free press provision of the Delaware Constitution, Art[icle] 1, [§] 5, has the same scope as the First Amendment [of the United States Constitution]"). Balanced against this provision is Article I, Section 9 which "establishes a protectible interest in one's reputation independent of any other tangible loss." Holland, *supra* note 1, at 76.

[12] Rodney A. Smolla, *Law of Defamation* § 1:27 (2d ed. 2015).

Although I focus my dissent on just one of the eleven challenged articles, that article is the fulcrum of Page's Complaint. I disagree with the Majority that Page did not adequately allege that it is reasonably conceivable that Oath, acting through Michael R. Isikoff ("Isikoff"), the author of the article dated September 23, 2016 entitled "*U.S. intel officials probe ties between Trump adviser and Kremlin*," published on Oath's Yahoo website (the "Isikoff Article" or "Article"), acted with actual malice.[13] I also disagree with the Majority that the Isikoff Article was substantially true. Finally, I disagree that the fair report privilege applies. It is well established that a person cannot "confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him."[14] Page alleges a collusive arrangement here.

---

[13] *Century Mortg. Co. v. Morgan Stanley Cap. Holdings LLC*, 27 A.3d 531, 537 (Del. 2011) ("[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"). *See Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (While assessing a motion to dismiss, Delaware courts will "view the complaint in the light most favorable to the nonmoving party, accepting as true its well-pled allegations and drawing all reasonable inferences that logically flow from those allegations."); *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) ("[I]n ruling on a motion to dismiss under Rule 12(b)(6), a trial court must draw all reasonable factual inferences in favor of the party opposing the motion."). The Isikoff Article was available on the Internet and the substance of the article was published by Oath and made available worldwide.

[14] Restatement (Second) of Torts § 611 cmt. c. (1977). For example, Page argues that, "Isikoff knew that the entire subject of the investigation was contrived, knew of the unreliable reputation of the person who had concocted it, knew that the dossier was sent to the FBI so that Isikoff could 'report' on it, and then used the claim of a governmental investigation to lend credence to this otherwise incredible tale." Reply Br. at 23. The Majority does not address this basis for the Superior Court's dismissal.

*A. The Isikoff Article Was Not Substantially True*

With respect to the Isikoff Article, the Superior Court identifies Page's claims of falsity as centering on the following statements:

- Page met with Russian official Sechin and Diveykin in the Kremlin;

- U.S. officials had received intelligence reports of these meetings;

- A well-placed Western intelligence source had told Yahoo! News that U.S. officials had received these reports; and,

- The author of the Isikoff Article (Michael Isikoff) knew these statements were false, or probably false.[15]

The Article's use of the terms "intelligence reports" and "well-placed Western intelligence source" renders significant aspects of the article false including the following key statement:

> But U.S. officials have since received *intelligence reports* that during that same three-day trip, Page met with Igor Sechin, a longtime Putin associate and former Russian deputy prime minister who is now the executive chairman of Rosneft, Russian's leading oil company, *a well-placed Western intelligence source tells Yahoo News*.[16]

Page alleges that the "intelligence reports" were, in fact, "opposition research" conducted by Christopher Steele, "a biased and unreliable private foreign national with no first-hand knowledge who Clinton campaign operatives paid,"[17] and that the Isikoff Article created a

---

[15] A269 (Superior Ct. Op.).

[16] A79–80 (Isikoff article) (emphasis added).

[17] A203 (Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss at 12); *see also* A22 (Compl. ¶¶ 30–31) ("The basis for this allegation was not a 'well-placed Western intelligence source.' This statement was a lie. In fact, it was Christopher Steele [], Fusion FPS and their associates, who had compiled blatantly false statements involving Dr. Page.").

37

"deceitful implication that the documents referred to were actual U.S. Government reports."[18] He alleges further that these descriptions "provided a cloak of authenticity and thereby concealed reality."[19] Page's alleged meetings with certain Russian officials are the focus of the Article. His allegations that the Article falsely characterized its sources who "reported on" these meetings (which Defendants now tacitly agree never occurred) easily pass Delaware's lenient "reasonable conceivability" pleading threshold.

However, the Superior Court disagreed.[20] It reasoned that as a general matter, "the article simply says that U.S. intelligence agencies were investigating reports of Plaintiff's meetings with Russian officials, which Plaintiff admits is true, and led to his surveillance for over a year under FISA warrants."[21]

The Superior Court dismissed Page's arguments with the following passage:

> Dr. Page puts particular emphasis on items (2) and (3), above, contending that (a) the Dossier was not an "intelligence report," but rather opposition research, and (b) Steele should not be considered a well-placed Western intelligence source. To me this argument is either sophistry or political spin. An intelligence report is simply a report of information potentially relevant to an investigation. It can take many forms, be true or false, and can be used as opposition research and an intelligence report. Dr. Page also argues that labelling the Dossier an intelligence report suggests that it comes from a governmental agency. None of Dr. Page's descriptions or interpretations of intelligence report meet the standard of what a reasonable person would conclude, which is the standard I must apply.

---

[18] A158 (Def.'s Opening Br. in Supp. of Mot. to Dismiss at 5).

[19] A23 (Compl. ¶ 34).

[20] A270 (Superior Ct. Op.).

[21] *Id.*

38

Additionally, in my view the use of the term "well-placed intelligence source" does not unfairly give credence to the reporting. Again, in my opinion, the description was fair, and did not defame Dr. Page.[22]

Summing up its conclusions quoted above, the Superior Court held that, "[w]hether that investigation was confirmed by a well-placed Western intelligence source or based on an intelligence report would make little difference in the mind of the average reader."[23] I disagree with this conclusion and with Oath's contention that of the Article's use of these terms is either true, substantially true, or immaterial.

Oath defends its use of the term "intelligence report" by arguing that anything reported to an intelligence agency is an "*intelligence report*." For example, Oath has argued in this case that, "it is literally true that the Steele Dossier was an 'intelligence report' because, as Page admits, it was reported to intelligence agencies."[24]

At oral argument, Oath doubled down on its position that anything sent to an intelligence agency qualifies as an "intelligence report." Oath's counsel agreed that if I sent a daily weather report to the C.I.A., that would be an "intelligence report":

> THE COURT: . . . But your position in your briefing before this Court is essentially that any report issued or sent to a U.S. intelligence agency is an intelligence report?
>
> COUNSEL: Yes, I think as . . .
>
> THE COURT: So, if I send the C.I.A. a weather report that it's going to be seventy-seven and sunny today, that's an intelligence report?

---

[22] *Id.*

[23] A271 (Superior Ct. Op.).

[24] A240 (Def.'s Reply Br. in Supp. of Mot. to Dismiss at 6).

COUNSEL:  Yes, I think that's, as the term is used in this particular article, that is true.  The way that the article was using that term was simply to refer to intelligence that was received by the intelligence agencies, not reports that were issued by the intelligence agencies, or that were verified by intelligence agencies in any way.  So, I think that the way the Superior Court put it below was, this could be political opposition research, it can be even unreliable as Dr. Page argues, that doesn't make it not and [*sic*] intelligence report.[25]

Aside from its circularity, Oath's strained position does not allow for any distinction between a mere "report" and an "intelligence report," even though the Isikoff Article uses both terms -- "reports" and "intelligence reports."[26]  Use of both terms within the Article would suggest to the average reader that there is a difference between the two, and that an "intelligence report" is something more than a mere "report."  In essence, Oath argues that how it describes its source of the defamatory statements is immaterial.  The case law is not on Oath's side.

Page's allegation of falsity and deceit is premised on the notion that in the context of the Article, an "intelligence report" bears some imprimatur of an official U.S.

---

[25]      Oral      Argument      video      at      23:55–26:55, https://livestream.com/delawaresupremecourt/events/9878231/videos/226565727.

[26] The Isikoff Article uses both the term "reports" and "intelligence reports" a combined total of five times.  A76–80 (Isikoff Article).  The five references are as follows.  "After one of those briefings, Senate minority leader Harry Reid wrote FBI Director James Comey, citing *reports* of meetings between a Trump adviser (a reference to Page) and 'high ranking sanctioned individuals' in Moscow over the summer . . . ."  A76 (Isikoff Article) (emphasis added).  "The source added that U.S. officials in the briefings indicated that *intelligence reports* about the adviser's talks with senior Russian officials close to President Vladimir Putin were being 'actively monitored and investigated.'"  A77 (Isikoff Article) (emphasis added).  "At the time, Page declined to say whether he was meeting with Russian officials during his trip, according to a Reuters *report*."  A79 (Isikoff Article) (emphasis added).  "But U.S. officials have since received *intelligence reports* that during that same three-day trip, Page met with Igor Sechin, a longtime Putin associate and former Russian deputy prime minister . . . .."  A79–80 (Isikoff Article) (emphasis added).  "U.S. intelligence agencies have also received *reports* that Page met with another top Putin aide while in Moscow— Igor Diveykin."  A80 (Isikoff Article) (emphasis added).

intelligence agency and is more than a mere "report." He is correct that the context of the story matters.[27] Although a defendant may avoid liability for defamation if it shows that its statements were "substantially true," a "defamatory statement must be viewed in context, and a defendant cannot use truth as a defense where 'the implication of the communication as a whole was false.'"[28] The test of whether a statement is substantially true is "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced."[29]

I think the average reader would agree that in this context an "intelligence report" is a report issued by, or at least bearing the imprimatur of, an intelligence agency as opposed to any report sent to an intelligence agency by anyone on any subject. More to the point, when reading this article, the average reader reading an article entitled, "*U.S. intel officials probe ties between Trump adviser and Kremlin*," would be quite surprised to learn that the "intelligence reports" referred to were actually, as Page alleges, "unfinished reports submitted by Steele in exchange for compensation paid to him by the DNC

---

[27] *See, e.g., Kanaga*, 687 A.2d at 179 ("It is the context which is critical."); *DeAngelis v. Hill*, 847 A.2d 1261, 1269 (N.J. 1964) ("In making this determination, courts must consider three factors: (1) the content, (2) the verifiability, and (3) the context of the challenged statement."); *American Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 844–45 (M.D. Tenn. 2021) (holding plaintiff's allegations of defamation survive a motion to dismiss and observing that, "[i]mportantly, context matters," and that "whether [p]laintiff's allegations are true must also be determined in context").

[28] *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (citation omitted) (noting also that "[t]hough we are not aware of any Pennsylvania Supreme Court case on the point, inferior Pennsylvania courts applying Pennsylvania law have concluded that defamation may be established where a statement, viewed in context, creates a false implication," and that this is so "even if the statement is 'literally true'").

[29] *Matovcik v. Times Beacon Rec. Newspapers*, 46 A.D.3d 636, 638 (N.Y. App. Div. 2007).

[Democratic National Committee] and their sponsored presidential campaign."[30] Knowing the true source of the so-called "intelligence reports" would materially affect the average reader's assessment of the trustworthiness of the statements in the Article. In short, it would matter to them.[31] And, as explained below, the source and nature of the report matters in determining whether the fair report privilege applies.

Similarly, as for Isikoff's use of the phrase, "*well-placed Western intelligence source*," I believe that the average reader would not consider Steele to be a "well-placed Western intelligence source." Page alleges in his Complaint that

> [i]f the average reader knew the truth — that the source was functioning as a hired gun PI firm for a political opponent, they would not have given the statements anywhere near the same weight as a leak from the CIA, FBI, or any other legitimate intelligence agency. In fact, they likely would have given the statements *no* weight at all.[32]

I do think it would make a difference to the average reader to know that the source of Page's alleged meeting with Sechin was not acting as an agent of a legitimate Western intelligence agency, but rather, was Christopher Steele, who Page alleges, received payments that "were funneled through the DNC's [Democratic National Committee's] law

---

[30] A4, A23 (Compl. ¶¶ 4, 34).

[31] *See, e.g., Sharon v. Time, Inc.*, 599 F. Supp. 538, 582 (S.D.N.Y. 1984) (Material questions of fact existed as to whether Time's story was published with actual malice where, by attributing its version of the Bikfaya meeting to the Commission of Inquiry's appendix, "Time qualitatively transformed it from a news magazine's view of the facts into a finding by a widely respected, quasi-judicial body.").

[32] A55 (Compl. ¶ 105).

firm, and their subcontractor Fusion GPS – an entity operated by Chief Investigative Reporter Michael Isikoff's long-time friend, Glenn Simpson."[33]

Page further argues that the deceitful impression created by the use of the terms "intelligence report" and "well-placed Western intelligence source" was enhanced by the use of other techniques. Page alleges, for example, that Isikoff knew Page never met with Sechin but used qualifying words and the passive voice to suggest that he did. The Isikoff Article states:

> That meeting, *if confirmed*, is viewed as especially problematic by U.S. officials because the Treasury Department in August 2014 named Sechin to a list of Russian officials and businessmen sanctioned over Russia's "illegitimate and unlawful actions in the Ukraine."[34]

The defendants have not disputed that Page never had such meetings.[35] The Superior Court concluded that "[t]he article does not claim that Plaintiff actually' [*sic*] met with those officials."[36] The Superior Court also reasoned that under Delaware law, "[i]mmaterial errors do not render a statement defamatory so long as the 'gist' or 'sting' of the statement is true."[37] It stated that, "[h]ere, the gist of the Isikoff Article is that the U.S.

---

[33] A23 (Compl. ¶ 34).

[34] A80 (Isikoff Article) (emphasis added).

[35] Page argues that, "there is no dispute that Carter Page did not hold a meeting, surreptitious or otherwise, with Russian agents." Opening Br. at 35. Appellees did not dispute this. Page also alleges that, "the FBI has concluded that this allegation against Dr. Page was a complete fabrication, with no basis in fact." A26–27 (Compl. ¶ 42).

[36] A270 (Superior Ct. Op.).

[37] A271 (Superior Ct. Op.) (alteration in original) (citing *Pazuniak L. Office, LLC v. Pi-Net Int'l, Inc.*, 2016 WL 3742772, at *6 (Del. Super. July 7, 2016)).

government was investigating possible meetings between Plaintiff and Russian officials."[38]

Page disagrees. Page's Complaint, in paragraph 29, summarizes the "gist" of the Isikoff Article differently:

> The article is false and defamatory (attached as Exhibit 1). The gist of the 2016 Yahoo Article conveyed that Dr. Page was a traitor to his country — a crime punishable by death — and was conspiring with a potentially hostile foreign power to the detriment of the United States. It falsely claimed that Dr. Page met with the Kremlin (specifically with Sechin and Diveykin).[39]

Page further alleges that the "gist" of the article is that the intelligence reports and the "well-placed Western intelligence source" that implicated him were credible when, as alleged by Page, Isikoff knew the source of the reports (Steele and the Steele dossier) were not, and that he (Isikoff) knowingly participated in a conspiracy to undermine the Trump campaign. In a nutshell, Page alleges that: Isikoff knew the Steele assertions were false, once the Steele Dossier was submitted to the FBI, Isikoff, as part of the plan to "plant the story," wrote a "groundbreaking" article that claimed "reports" from a "Western intelligence source" had been submitted to the FBI implicating Page.[40]

Viewing Page's allegations as true, I believe that he has stated a claim that the statements described above in the Isikoff Article are false. Even in a world where the "truth" struggles to find its true north in the midst of the whirlwind of political strife, Page's allegations that the Article is not substantially true easily pass muster. At the very minimum, the disagreement over what the "gist" or the "sting" of the Article is should be

---

[38] *Id.*

[39] A21–22 (Compl. ¶ 29).

[40] A21–27, A46, A50–52, A55 (Compl. ¶¶ 29–43, 87, 95, 98–99, 105).

a question for the jury. This was the case in *Schiavone Construction Co. v. Time, Inc.*,[41] where the United States Court of Appeals for the Third Circuit addressed the parties' competing versions of the "gist" of the article and held that "the determination of falsity depends in large part on the 'sting' of the article, which . . . is a question for the jury."[42]

The Majority's treatment of Page's collusion theory — a crux of his entire complaint — is worthy of comment. The Majority states that the allegations of a conspiracy "must be cribbed together from conclusory connections among the parties involved."[43] That is an odd assertion when (i) the alleged conspiracy is a central theme of Page's Complaint (ii) the briefing and argument before this Court centered on it; and (iii) my Colleague in the Majority characterized Page's conspiracy theory during oral argument as Page's "core

---

[41] 847 F.2d 1069 (3d Cir. 1988) (The Third Circuit noted that the question of whether the privilege applies does not need to go to the jury when the case presents "a clear example of an unfair report that does not deserve the qualified privilege to reproduce libel.").

[42] *Id.* at 1073; *see also Lawrence v. Bauer Pub. & Printing Ltd.*, 446 A.2d 469, 473 (N.J. 1982) (For the defense of truth to apply, "the truth must be as broad as the defamatory imputation or 'sting' of the statement.").

[43] Maj. Op. at 30. "Cribbed together" is an unfortunate characterization of Page's pleadings and presentation of his collusion theory. *Id.* It was coherent enough for my Colleague in the Majority to recognize it as Page's core issue at oral argument before this Court.

issue."[44] Notwithstanding Page's lack of access to discovery at this stage, his allegations are sufficiently well-pleaded.[45]

Further, in big picture terms, instead of presuming Page's allegations of conspiracy and collusion to be true, the Majority attempts to rebut them with various statements from a report outside the record (the Inspector General's Report) to argue that at the time of publication, there was already an investigation underway that was "not in response to the Isikoff Article or even the Steele Dossier."[46] It then concludes that, based on certain facts taken from this report, the Isikoff Article is true or substantially true because it merely reports on an ongoing investigation. My problem with this approach is that (i) the Majority, in effect, has stepped into the role of fact-finder, thereby depriving Page of his opportunity to develop the record according to the normal process (discovery, depositions under oath, tested by cross-examination, etc.); and (ii) the "rebuttal" does not undercut Page's theory in any event.

---

[44] The following question was posed to Oath's counsel at oral argument:

> [Chief Justice Seitz]: Can we just spend a minute on what I think is their core issue which is that this was all conspiracy? And if you look at it in that light at least as is being alleged, it was all a big conspiracy, doesn't that get them to discovery in this case because reasonable doubts have been raised about whether what was written really had a basis in fact?

Oral Argument video at 30:15–50, https://livestream.com/accounts/5969852/events/9878231/videos/226565727. I submit that the answer to this question is "yes." The Majority also tries to sidestep the collusion/conspiracy theory by saying that it has no bearing on the truth, but rather, it relates only to the "actual malice" inquiry. Again, although the Majority is critical of the Complaint's organization, the question posed above suggests the answer which is that the collusion/conspiracy theory relates to both.

[45] *See e.g.,* A10–11, A12, A22, A27, A36, A39–43, A45–46 & A53–57 (Compl. ¶¶ 4–6, 8–9, 29, 34, 44, 68–69, 72–78, 83, 86, 102, 105–07 & 111).

[46] Maj. Op. at 22. The Inspector General's Report is referred to herein as the "I.G. Report."

46

First, the Majority cannot properly rely upon the I.G. Report to resolve competing versions of the facts on a motion to dismiss.[47] Moreover, the Majority cannot have it both ways: it cannot argue that the allegations in Page's Complaint are conclusory, but then rely upon the I.G. Report to dispute and then resolve any factual issues against Page.[48]

---

[47] *See In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *68 n.834 (Del. Ch. May 6, 2021) (justifying the court's review of books and records documents cited in the complaint because the documents were incorporated by reference or integral to the complaint, but recognizing that the court "cannot weigh competing factual interpretations of incorporated documents on a motion to dismiss"); *id.* ("Where a defendant improperly and extensively uses Section 220 Documents in support of a Chancery Rule 12(b)(6) motion to support factual inferences that run counter to those supported in the complaint, the court may either exclude the extraneous matter from its consideration or convert the Chancery Rule 12(b)(6) motion into a motion for summary judgment so that the plaintiff may take discovery before the court determines if pre-trial dispositive relief is appropriate."). Moreover, the Majority's reliance on the I.G. Report is not akin to a corporate case incorporating a proxy statement by reference on a motion to ascertain whether certain information was disclosed. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995) (recognizing that the practice of considering documents referred to in the complaint when ruling on a motion to dismiss has been "viewed and justified by the federal courts as a necessary, but limited, exception to the standard Rule 12(b)(6) procedure" and that "[t]he exception has been used in cases in which the document is integral to the plaintiff's claim and incorporated in the complaint" such as claims involving securities, purchase agreements, partnership agreements, and prospectuses). Therefore, courts limit when extrinsic documents may be relied upon. *See also Orman v. Cullman*, 794 A.2d 5, 15–16 (Del. Ch. 2002) (explaining that "[a]s a general rule, when deciding a Rule 12(b)(6) motion, the [c]ourt is limited to considering only the facts alleged in the complaint and normally may not consider documents extrinsic to it" however, there are two exceptions: (i) "when the document is integral to the plaintiff's claim and incorporated into the complaint" and (ii) "when the document is not being relied upon to prove the truth of its contents").

[48] For example, the Majority argues that the Steele Dossier and Isikoff Article had no bearing on the investigation's focus on Page. *See* Maj. Op. at 8 (suggesting that even though the FBI granted the FISA warrant, based in part on the Steele Dossier and Isikoff Article, on October 21, 2016—less than a month after the Isikoff Article was published — the broader, "multi-pronged" investigation had started in July 2016, and the Crossfire Hurricane team received the Steele information on September 19, 2016). The Majority attempts to diminish the weight to be given to the Steele Dossier by emphasizing that the warrants also reflect upon "other information." But at this stage, the inferences must be drawn in Page's favor, as opposed to weighing the evidence. The Majority also argues that Steele was "well placed" because he had been a confidential human source to the FBI since 2013 and had provided "helpful information to the FBI in the past." Maj. Op. at 25. And in reciting its version of "true facts," the Majority asserts that, "[t]he Isikoff Article

47

Second, Page's collusion theory is not inconsistent with the proposition that a federal investigation was ongoing. Rather, he asserts that the sources for the investigation(s) all relied on, and tied back to the Steele Dossier which Isikoff knew to be false. He also asserts that the investigation began focusing on him in earnest in response to Steele providing the Dossier to the FBI and Steele's talking to Isikoff and *Yahoo News*. Page argues that:

- "Here is the truth, as alleged in the Amended Complaint: that Isikoff knew the Steele fabrications were false (Am. Compl. ¶ 107), that he had a hand in sending them to the FBI, and then, once they were submitted, wrote a 'ground-breaking' story that breathlessly claimed that 'reports from a Western intelligence source' had been submitted to the FBI implicating Trump advisor Carter Page (*Id.* ¶ 29–43, 87, 95, 98–99, 105). That's the Russian collusion scandal, reduced to its essence. The Isikoff Article is not true, nor is its 'gist' substantially true. The entire tone and tenor of the article unmistakably connotes a 'false gist' and that gist is that the reporter had come across an ongoing federal investigation involving corruption and disloyalty at the highest possible level. Yet Isikoff was clever: his article unmistakably conveys this clear implication, but does so through the crafty deployment of qualifying words and passive verbs that seek to disguise his actual knowledge and participation."[49]

- "The blame [Isikoff] puts on the 'multiple sources' is facile and misleading: Isikoff knew these sources all relied on the Steele report, which he knew to be fabricated."[50]

---

describes the existence of the Steele Dossier, that it was provided by an intelligence source, and how long it was being investigated by U.S. Intelligence agencies." Maj. Op. at 25. But nowhere does the article even mention Steele or his Dossier. Further, there is no reference to the Steele Dossier's source.

[49] Opening Br. at 36.

[50] *Id.* at 39.

- "It also should matter that the FBI eventually realized and stated publicly that there had been but one source, Steele, and that it had mistakenly taken Isikoff's Article as a second source."[51]

- "The truth, of which Isikoff was fully aware, was that it was Steele who generated the fake materials that were transmitted to these 'Democratic leaders.'"[52]

Accordingly, saying that an investigation was already underway does not undercut Page's collusion theory. Indeed, even the I.G. Report states that while the "Crossfire Hurricane" investigation opened on July 31, 2016, "the Crossfire Hurricane team's receipt of Steele's election reporting on September 19, 2016 played a central and essential role in the FBI's and Department's decision to seek the FISA order."[53] In fact, the I.G. Report expressly discussed how the focus on Carter Page was ignited as a result of the receipt of the Steele Dossier:

> Shortly after opening the Carter Page investigation in August 2016, the Crossfire Hurricane team discussed the possible use of FISA-authorized electronic surveillance targeting Page, which is among the most sensitive and intrusive investigative techniques. As we describe in Chapter Five, the FBI ultimately did not seek a FISA order at that time because OGC, NSD's Office of Intelligence (OI), or both determined that more information was needed to support probable cause that Page was an agent of a foreign power. *However, immediately after the Crossfire Hurricane team received Steele's election reporting on September 19, the team reinitiated their discussions with OI and their efforts to obtain FISA surveillance authority for Page, which they received from the FISC on October 21.*[54]

Four days later, after meeting with Steele, Isikoff published the Article.

---

[51] *Id.* at 39 n.9.

[52] *Id.* at 39–40.

[53] I.G. Report at vi.

[54] *Id.* at iv–v (emphasis added).

The Majority, relying on the 400-plus page I.G. Report, acknowledges that Steele delivered the Dossier to FBI agents and then "told Isikoff that he had delivered the report and described the contents of the Steele Dossier."[55] The Majority also acknowledges that the FBI then sought the FISA warrants which were based on, among other things, Steele's information and the Steele Dossier.[56] Thus, even the Majority acknowledges that delivery of the Steele Dossier to the FBI was followed shortly thereafter by the Isikoff Article, which was followed by the I.G. investigation's focus on Page. As the I.G. Report makes clear, the FISA warrants expressly referenced the Isikoff Article.

The bottom line is that even if the authorities were, more broadly, investigating possible interference with our elections by the Russian government prior to the September 23, 2016 publication of the Isikoff Article, that does not undercut Page's allegations that Steele and Isikoff colluded in the publication of defamatory statements relating to his alleged meetings with Russian officials. Rather, the I.G. Report's specific references to the Isikoff Article support Page's theory about Steele colluding with Isikoff. It observes, for example that:

> As detailed in Chapter Nine and discussed later in this chapter, beginning in July 2016, Steele had multiple contacts with Department attorney Bruce Ohr about his reports. That same month, Steele first provided his election reporting to the State Department. In August 2016, the FBI received correspondence from Members of Congress that described information included in the Steele reports, and in September 2016, Steele met with journalists from The *New York Times*, *The Washington Post*, *Yahoo News*, *The New Yorker*, and CNN about his work. Steele in fact was the "Western Intelligence Source" referenced in the September 23, *Yahoo News* article

---

[55] Maj. Op. at 6.

[56] *Id*.

50

entitled, "*U.S. Intel Officials Probe Ties Between Trump Advisor and Kremlin,*" that described efforts by U.S. intelligence to determine whether Carter Page had opened communication channels with Kremlin officials. The FBI did not ask Steele whether he was a source for the article, nor did it question Steele about the apparent dissemination of his election reporting to other parties.[57]

If the I.G. Report is to be considered, then one cannot ignore the numerous references in it that suggest that the investigation into Page, including the FISA surveillance, is a direct result of the Steele Dossier and the Isikoff Article. The following are just a few more references, some of which state that Steele and Isikoff spoke prior to the article's publication:

- The first FISA application erroneously "[a]sserted that the FBI has assessed that Steele did not directly provide to the press information in the Septembers 23 *Yahoo News* article based on the premise that Steele had told the FBI that he only shared his election-related research with the FBI and Fusion GPS, his client; this premise was incorrect and contradicted by documentation. . .."[58]

- "On September 23, 2016, *Yahoo News* published an article stating that U.S. intelligence officials had received reports regarding Carter Page's private meetings in Moscow with senior Russian officials. The article cited a 'well-placed Western intelligence source,' and contained details about Carter Page's activities in Russia that closely paralleled the information contained in the reporting that Steele had provided to the FBI. We found no evidence that anyone from the FBI asked Steele in September 2016 or at any other time, if he had spoken with the *Yahoo News* reporter. *Steele had, in fact, spoken with the reporter prior to the article's publication, which the FBI would learn*

---

[57] I.G. Report at 387.

[58] *Id.* at ix. *See also id.* at 106 (stating that Steele believed that the sourcing for Isikoff's Article "came from within the U.S. government;" however, "portions of the article align with information contained in Steele's Report 94," and Isikoff confirmed that the information for the article was provided by Steele).

*from public records after the submission of the first FISA application.*"[59]

- "The draft FISA applications, and later the read copy and final application, advised the court that the *Yahoo News* article reported that U.S. intelligence officials were investigating Carter Page's involvement in suspected efforts by the Russian government to influence the U.S. presidential election and that a 'well-placed Western intelligence source' told *Yahoo News* about Carter Page's alleged secret meetings with Sechin and Divyekin. The applications stated that, based on statements made in the *Yahoo News* article and in other news articles, individuals affiliated with the Trump campaign made statements distancing the campaign from Carter Page."[60]

Thus, the Majority's conclusions that the Article is true because it merely reports on an ongoing investigation of Page that was not prompted by the Steele Dossier or the Isikoff Article cannot stand up either by reference to the Complaint alone or by reference to the additional "facts" drawn from outside this Court's record.[61]

In addition, the Majority's reliance on the I.G. Report, and its reference to Steele as a former intelligence operative for British Secret Intelligence MI6, presumably in support of the Isikoff's Article's qualification of Steele as a "Western intelligence source," is also odd. First, Steele was not identified in the article as the source.[62] Even more, the I.G.

---

[59] *Id.* at 5 (emphasis added).

[60] *Id.* at 144–45.

[61] *See also Windsor I, LLC*, 238 A.3d at 875 (declining to dismiss an action based on information contained within an extrinsic document because "we d[id] not wish to create a precedent which could be viewed as relaxing the rules regarding considering matters extrinsic to the complaint in a Rule 12(b)(6) context").

[62] The Majority acknowledges that we are to judge the truth of the statements in the article at the time of publication. Maj. Op. at 22 n.98.

Report discredits Steele as a reliable source and supports Page's allegations concerning

Steele's motivations. For example, the I.G. Report notes that:

- "Steele's handling agent told us that when Steele provided him with the first election reports in July 2016 and described his engagement with Fusion GPS, it was obvious to him that the request for the research was politically motivated."[63]

- "We found that the FBI did not have information corroborating the specific allegations against Carter Page in Steele's reporting when it relied upon his reports in the first FISA application or subsequent renewal applications."[64]

- "We concluded that, at the outset of Steele's interactions with the FBI in July 2016 regarding his election reporting work, it was clear that Steele was operating as a businessperson working on behalf of a client of his firm, rather than as a CHS [Confidential Human Source] for the FBI."[65]

- "[W]e found that even after the FBI closed Steele as a CHS in November 2016 for cause, and as a result, under FBI policy should have ceased its contact with Steele absent exceptional circumstances or reopening him as a CHS, the FBI continued its relationship with Steele by allowing Steele to regularly provide information to the FBI through a senior Department attorney, Bruce Ohr, with whom Steele was friendly."[66]

- "[W]e found that members of the Crossfire Hurricane team failed to meet the basic obligation to ensure that the Carter Page FISA applications were 'scrupulously accurate,' . . .. For example, the Crossfire Hurricane team obtained information from Steele's Primary Sub-source in January 2017 that raised significant questions about the

---

[63] I.G. Report at v.

[64] *Id*. at viii.

[65] *Id.* at 387.

[66] *Id*. at 390.

reliability of the Steele reporting that was used in the Carter Page FISA applications."[67]

- "In the preparation of the FISA applications to surveil Carter Page, the Crossfire Hurricane team failed to comply with the FBI policies, and in so doing fell short of what is rightfully expected from a premier law enforcement agency entrusted with such an intrusive surveillance tool."[68]

I submit that rather than engaging in appellate fact-finding which we are neither supposed to do, nor equipped to do, especially based upon documents not in the record, this Court should reverse and allow discovery to proceed in the normal course so that a proper factual record can be developed by the parties.

## B. Page Adequately Alleged Actual Malice

Oath admits that it did not raise, as a ground for dismissal, the failure to adequately plead "actual malice." As a result, the Superior Court did not address the issue of actual malice as it relates to the Isikoff Article.[69] I believe that Page has adequately alleged actual malice.

As noted above, in *New York Times v. Sullivan*,[70] the United States Supreme Court established the standard of fault, *e.g.,* "actual malice" that public figures must satisfy in

---

[67] *Id*. at 413. As I note, one of Steele's sub-sources has been arrested for lying to the FBI. *See* sources cited *infra* note 100.

[68] I.G. Report at 414.

[69] *See* Answering Br. at 45 n.10 (Oath argues that "[b]ecause the Yahoo Article is literally true, . . . Oath did not need to raise this issue at the motion to dismiss stage, and the Superior Court therefore did not address it.").

[70] *Sullivan*, 376 U.S. 254.

defamation cases. Actual malice means that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."[71]

The Supreme Court also explained whose "actual malice" must be shown. It stated that "the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement."[72] Page has chosen to "identify and allege the publisher Oath to be the person responsible."[73] He argues that Oath knew the truth and decided to publish a falsehood anyway, and in particular, he argues that "Oath, acting through its employee Isikoff, and in concert with others, is the 'person responsible' for its own publication."[74]

---

[71] *Id.* at 280. *See also State Farm Fire & Cas. Co. v. Radcliff*, 987 N.E.2d 121, 148 n.26 (Ind. Ct. App. 2013) ("Actual malice is a term of art used to describe the First Amendment protections for speech injurious to reputation and should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.") (citing *Love v. Rehfus*, 946 N.E.2d 1, 14, n.12, 32 I.E.R. Cas. (BNA) 316 (Ind. 2001)). "The United States Supreme Court has provided examples of the kind of proof that would likely support a finding of actual malice: (1) the defendant fabricates the publication; (2) the publication is the product of the defendant's imagination; (3) the publication is based wholly on an unverified anonymous telephone call; (4) the communication is so inherently improbable that only a reckless person would have published it; or (5) there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 148. Here Page alleges aspects of most of these examples -- a fabricated and false story attributed to a misdescribed and unidentified source whose veracity was questionable at best.

[72] *Sullivan*, 376 U.S. at 287; *see also Sharon*, 599 F. Supp. at 564 ("[A] plaintiff may prove the actual malice of a press defendant by relying on the acts of all of the defendant's employees performed within the scope of their employment.") (citing *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253 (1974)). The actual malice test is a subjective one. *See St. Amant*, 390 U.S. at 731 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.").

[73] Opening Br. at 27.

[74] *Id.* at 28.

The following allegations in his Complaint adequately support his argument that Isikoff and Oath, acting through Isikoff, acted with actual malice:

- Oath knew that the reports it relied on contained "clear errors," yet Oath failed to "verify the incredible accusations asserted by Steele and Fusion GPS" and published them.[75]

- Isikoff claimed he received his information from a "well-placed Western intelligence source" when in fact he did not, and he knew it.[76]

- "The Defendant intended the statements to be interpreted by the average reader as truthful statements of fact. That is why it referenced a 'well-placed Western intelligence source.' The Defendant tried to create credibility for the article's source with reckless — possibly intentional — disregard for the truth or falsity of the statements. And that is how the average reader could reasonably construe the statements."[77]

- "Defendant acted with reckless disregard of whether these statements were true or false. BuzzFeed received these statements, spent weeks attempting to verify, and ultimately concluded that all it could report was that Fusion GPS's allegations:
  - were 'specific, unverified, and potentially unverifiable allegations';
  - they could not be 'verified or falsified';
  - were 'prepared for political opponents of Trump'; and
  - 'not just unconfirmed,' but also 'include[d] some clear errors' and obvious misspellings."[78]

- "Fusion GPS has also admitted that its reports were factually flawed and not meant for public consumption or publication. Yet, the Defendant's 'brands' published the statements that were false as they were malicious and defamatory to Dr. Page."[79]

---

[75] A44 (Compl. ¶ 80–81).

[76] A51 (Compl. ¶ 99).

[77] A51 (Compl. ¶ 98).

[78] A56–57 (Compl. ¶ 109) (alteration in original).

[79] A58 (Compl. ¶ 115).

- "When Defendant made the defamatory statements, it knew that they were false or acted in reckless disregard of the truth or falsity of the statements. Defendant failed to conduct any reasonable investigation. Further, Defendant knew or should have known the falsity of the statements, and with such knowledge, should not have publicly disseminated the defamatory statements. Therefore, Defendant made the statements with actual malice."[80]

The actual malice inquiry centers on "a defendant's attitude toward the truth or falsity of the publication," on his "subjective awareness of its probable falsity," and on his "actual doubts as to its accuracy."[81] And "[c]ourts . . . routinely permit objective facts to be introduced to prove or disprove the existence of actual malice."[82] For example in *Herbert v. Lando*,[83] the United States Supreme Court held that plaintiffs were entitled to discovery to examine the editorial process in order to attempt to establish actual malice. I believe that Page's allegations are sufficient to entitle him to have his case proceed beyond the pleadings stage to discovery as to the Isikoff Article. My conclusion is supported by the Supreme Court's decision in *Harte-Hanks Communications, Inc. v. Connaughton*.[84]

In *Harte-Hanks Communications, Inc.*, the United States Supreme Court considered what conduct on the publisher's part could constitute "actual malice." In that case, the

---

[80] A69 (Compl. ¶ 149). Page alleged that Isikoff left him two cryptic voicemails asking Page to call him but gave Page no explanation of why he was calling. A44–45 (Compl. ¶¶ 82–83). No other attempts were made to contact Page.

[81] *Lawrence*, 89 N.J. at 467–68 (emphasis omitted).

[82] Smolla, *supra* note 12, § 3.44 (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989)); *see also DR Partners v. Floyd*, 228 S.W.3d 493, 498 (Tex. App. 2007) ("Actual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the words or acts of the defendant before, at, or after the time of the communication.").

[83] 441 U.S. 153 (1979).

[84] 491 U.S. 657 (1989).

Supreme Court affirmed the Court of Appeals' conclusion that the record evidence supported a finding of actual malice.

The decision is instructive as the Supreme Court described what would *not* constitute actual malice. There the Court stated that "a public figure plaintiff must prove more than an extreme departure from professional standards and [] a newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice."[85] Further, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."[86] The Court also emphasized that "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term."[87]

Instead, actual malice "requires at a minimum that the statements were made with a reckless disregard for the truth."[88] Further, "the defendant must have made the false publication with a '*high degree of awareness of . . . probable falsity*,'[89] *or must have 'entertained serious doubts as to the truth of his publication*.'"[90]

---

[85] *Id.* at 665.

[86] *Id.* at 688.

[87] *Id.* at 666.

[88] *Id.* at 667.

[89] *Id.* (emphasis added) (citing *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

[90] *Id.* (emphasis added) (citing *St. Amant*, 390 U.S. at 731); *see also Pep v. Newsweek, Inc.*, 553 F. Supp. 1000, 1002–03 (S.D.N.Y. 1983) (stating that, "[f]acts such as [a] failure to investigate, or reliance on a questionable source are relevant to that [actual malice] determination: they may tend to show that a publisher did not care whether an article was truthful or not, or perhaps that the publisher did not want to discover facts which would have contradicted his source"). *Sharon*, 599

In *Harte-Hanks Communications, Inc.*, the finding of actual malice was based upon a failure by the Journal News newspaper to listen to certain interview tapes or to interview a key witness, Patsy Stephens. In finding the evidence sufficient, the Court explained:

> It is also undisputed that Connaughton made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them. Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her. Accepting the jury's determination that petitioner's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.[91]

Notably, the *Harte-Hanks* decision was a decision after trial. Here the question is whether Page, assuming his allegations are true, has satisfied our "reasonable conceivability" standard to allow him to advance to the discovery phase. I believe that he has. In addition to the allegations quoted above, Paragraphs 106 and 107 of his Complaint incorporate the *Harte-Hanks* standard:

> 106. Defendant harbored serious doubts about both the truth or falsity of the statements and Fusion GPS's reliability, lack of bias and political agenda. Defendant knew Fusion GPS's reputation: Fusion GPS was a liar for hire, a professional smear artist, and an active, biased participant in the political arena.[92]

---

F. Supp. at 560–85 (Trial judge denied Times, Inc.'s motion for summary judgment as there was sufficient admissible evidence of actual malice where a jury could find that Time's Jerusalem correspondent chose not to ask Source C the ultimate question because he knew or suspected that the answer could undermine the reporter's hypothesis.).

[91] *Harte-Hanks Commc'ns, Inc*, 441 U.S. at 692 (citation omitted).

[92] A55 (Compl. ¶ 106).

107. Defendant also knew that it had not seen any evidence supporting the allegations, and that the allegations rested upon anonymous hearsay from unverified, unreliable, and anonymous sources – and were routinely double anonymous hearsay statements contained within hearsay statements. Isikoff himself actually knew that some of Fusion GPS's allegations were likely false. Isikoff also knew that, in the political battlefield, disinformation campaigns and spin doctors wage war through private investigators to destroy their political enemies. Given the nature of Fusion GPS's accusations, Defendant knew, understood or intentionally ignored the fact that Fusion GPS was funded by individuals or entities with an anti-Trump agenda and bias. Indeed, the explanation of why Steele possessed the information used to create the Fusion GPS reports made clear that it was politically motivated.[93]

Page also alleges that Isikoff had reason to doubt the veracity of the Steele Dossier.[94] For example, he alleges that "Fusion GPS's unsavory reputation was not lost on Isikoff," and that "[h]e had actual knowledge of its reputation."[95] He alleges that "Isikoff and Simpson (Fusion GPS's founder) were longtime friends and colleagues," and that "[t]heir relationship had developed over the course of many years . . . ."[96] Page alleges that "even Steele, with whom Isikoff had direct access, described these reports as 'uncorroborated,' not designed to be finished products, and not to be consumed as 'written product[s].'"[97]

---

[93] A55–56 (Compl. ¶ 107).

[94] Page argues that "Isikoff knew these sources all relied on the Steele report, which he knew to be fabricated." Opening Br. at 39. He further notes that "the FBI eventually realized and stated publicly that there had been but one source, Steele, and that it had mistakenly taken Isikoff's Article as a second source." *Id*. at 39 n.9.

[95] A53 (Compl. ¶ 102); *see also Harte-Hanks Commc'ns, Inc*, 691 U.S. at 688 (quoting *St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant[.]")); *Lyons v. New Mass Media, Inc.*, 390 Mass. 51, 57, 453 N.E.2d 451 (1983) ("A major basis for inferring actual malice involves examination of the sources used by the reporter[.]").

[96] A53–54 (Compl. ¶ 102).

[97] A42 (Compl. ¶ 73) (alteration in original).

He alleges further that the "reports were not just unverified; on their face the various reports included clear errors and internal inconsistencies."[98] He also alleges that other news organizations, including the New York Times and Washington Post, decided not to publish the statements contained in the Steele Dossier.[99]

The personal bias of a source can be a factor in the actual malice determination.[100] For example, in *Flowers v. Carville*, the Ninth Circuit Court of Appeals stated that if "someone knows that the news story is false, he can't sanitize his republication by purporting to rely on the news source. Nor can he claim immunity if he has conflicting information from another source and recklessly disregards it."[101] Notably, the court in *Sharon v. Time, Inc.* stated that whether bias on the part of a news organization's source creates an issue of actual malice depends upon whether "sources were sufficiently

---

[98] A42 (Compl. ¶ 74).

[99] A43 (Compl. ¶ 78).

[100] *See, e.g.,* Smolla, *supra* note 12, § 3.58 ("At times reporters may hide from their own editors or superiors the identity of their sources, or otherwise appear to act in a misleading way regarding the actual identity of sources used, and such conduct may come into play in making an actual malice determination."); *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (finding actual malice where the defendants relied on a single person who had a known bias against the plaintiff and whose account had internal inconsistencies); *Pep*, 553 F. Supp. at 1002–03 (denying summary judgment because a reasonable jury could find that Newsweek acted with actual malice, and stating that "the issue is whether, knowing what Newsweek knew, — in particular, the identity and background of [the author's] principal source — the Newsweek staff 'in fact entertained serious doubts as to the truth of [the] publication'"). *Perk v. Reader's Dig. Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991) (In analyzing recklessness, "this Court must look at each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was.").

[101] *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002); *see also Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1255–56 (9th Cir. 1997) (concluding that the record supported findings of actual malice where the Enquirer sought to create the impression that it had directly interviewed Clint Eastwood, by among other things, marking the interview as "exclusive," when the interview never took place).

61

identified to permit assessment of the potential effect of their biases."[102]  Here, the source was not only indisputably concealed, it was allegedly falsely described in a manner to suggest credibility.[103]

At the heart of Page's complaint is an alleged conspiracy by various entities, including Fusion GPS, Glenn Simpson, and Christopher Steele to "invent a fictitious claim about hypothetical 'collusion' between the Russian government and the campaign of then-candidate for President Donald Trump."[104]  The conspiracy allegedly involved Isikoff publishing the information without any disclaimers, unlike the BuzzFeed article, which published the Dossier in full and did contain disclaimers.[105]  The use of the term "well-

---

[102] *Sharon*, 599 F. Supp. at 583.

[103] Although it has no bearing on my analysis herein, recent news reports further highlight the questionable veracity of the sources of reports written by Steele.  *See* Adam Goldman & Charlie Savage, *Authorities Arrest Analyst Who Contributed to Steele Dossier*, N.Y. TIMES, Nov. 4, 2021 (stating that "a series of reports written by Mr. Danchenko's employer, Christopher Steele, a former British intelligence agent—have not been proven, and some have been refuted, including by Mr. Mueller"), https://www.nytimes.com/2021/11/04/us/politics/igor-danchenko-arrested-steele-dossier.html; Devlin Barrett & Tom Jackman, *Igor Danchenko arrested, charged with lying to FBI about information in Steele dossier*, WASH. POST, Nov. 4, 2021 (reporting that "[a]n analyst who was a primary source for a 2016 dossier of allegations against Donald Trump has been arrested on charges that he repeatedly lied to the FBI about where and how he got his information"), https://www.washingtonpost.com/national-security/steele-dossier-arrest-danchenko-trump-durham/2021/11/04/7e76b9ae-3d77-11ec-8ee9-4f14a26749d1_story.html; Kevin Johnson, *Igor Danchenko, Trump dossier source, charged with lying to FBI in special counsel John Durham's Russia inquiry*, USA TODAY, Nov. 4, 2021 (reporting that Igor Danchenko "is charged with five counts of making false statements to investigators regarding sources of information he provided to Steele"), https://www.usatoday.com/story/news/politics/2021/11/04/igor-danchenko-steele-dossier-source-arrested-durham-probe/6281654001/.  Page alleges that "Steele received all of his information from a single primary sub-source" and that "the primary sub-source received all of his/her information from a network of secondary sub-sources."  A41 (Comp. ¶ 71).

[104] A10–11, A22 (Compl. ¶¶ 5, 31); *see also* A39–40 (Compl. ¶¶ 65–69).

[105] *See* A46–47 (Compl. ¶¶ 86–87).

placed Western intelligence source" was part of their plan "to convey to the average reader" their "false narrative."[106]

As the Supreme Court recognized in *Harte-Hanks*, public discussion of the qualifications of a candidate for public office "presents what is probably the strongest possible case for application of the *New York Times* rule."[107] And, no doubt, "[w]hen a candidate enters the political arena, he or she 'must expect that the debate will sometimes be rough and personal,' and cannot 'cry Foul!' when an opponent or an industrious reporter attempts to demonstrate 'that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches.'"[108] But the Isikoff Article goes beyond the permissible range of publishing false statements about an associate of a political candidate in the heat of a political battle. The notion that a false story would be concocted, then submitted to government agencies, and then reported widely as true, purporting to be supported by credible "intelligence" sources, goes beyond any sense of fair play and the wide range of First Amendment "breathing space." Instead, these allegations cross the pleadings boundary into the realm of false statements made with actual malice. This leads to my next point as to why the Fair Report privilege does not apply.

---

[106] A46 (Compl. ¶ 87).

[107] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 686.

[108] *Id.* at 687 (citations and quotations omitted). *See also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 575 (2011) ("Many are those who must endure speech they do not like, but that is a necessary cost of freedom.") (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210–11 (1975)).

*C. The Superior Court Erred in Holding that the "Fair Report" Privilege Applies*

Although the Majority does not attempt to defend the dismissal of the Complaint on the basis of the fair report privilege, it affirms the dismissal largely on the basis that the Article is substantially "true" because it merely reports on an ongoing investigation. But many of the reasons why the Article is not "true" also show why the fair report privilege does not apply.

I do not believe the fair report privilege applies because (i) the "intelligence reports" do not qualify for the privilege and the article was not fair; (ii) an alleged scheme was used to hide behind the privilege, which is disqualifying; and (iii) at a minimum, application of the privilege, if not deemed unavailable here as a matter of law, at least presents a factual issue. I address these points because I am concerned that letting the decision below stand on this point will inure to the detriment of other individuals who claim reputational harm under similar circumstances.

The fair report privilege "was designed as an exception to the common law rule that reproduction of a defamation is tantamount to making the defamation oneself. The purpose of the privilege is to assure that people who report on *official releases* about public concerns will not be held responsible for the contents of the reports."[109] However, a "defendant forfeits this qualified privilege . . . if the report is inaccurate or unfair."[110]

---

[109] *Schiavone Constr. Co*, 847 F.2d at 1085 (emphasis added) (citing W. Prosser & W. Keeton, *Prosser & Keeton on the Law of Torts*, 835–37 (5th ed. 1984)).

[110] *Id.*

64

The common law privilege was set forth in Section 611 of the Restatement (Second) of Torts. Section 611 states:

§ 611. Report of Official Proceeding or Public Meeting

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.[111]

To qualify, the report must be of an "official action or proceeding" and it must be "accurate and complete or a fair abridgment of the occurrence reported."[112]

Formulation and application of the privilege varies by jurisdiction. Page urged the Superior Court to apply Delaware law, and Oath, New York law. The Superior Court agreed with the Defendants that a choice of law analysis was unnecessary, and, therefore, it expressed no opinion on the choice of law.[113] New York has codified its fair report privilege.[114] Delaware has not; however, this Court has cited to Section 611 of the

---

[111] Restatement (Second) of Torts § 611 (1977). This Court has cited Section 611 with approval on two occasions. Neither case involved public figures. *See Kanaga*, 687 A.2d 173; *Read v. News-J. Co.*, 474 A.2d 119 (Del. 1984).

[112] Restatement (Second) of Torts § 611 (1977). *See, e.g., Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 11 (1969) (stating that accurate and truthful reports at public hearings are a matter of "particular First Amendment concern," as they involve "public meetings of the citizens of a community concerned with matters of local governmental interest and importance").

[113] A269 (Superior Ct. Op.).

[114] *See* N.Y. Civ. Rights Law § 74. New York's fair report privilege provides:

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

65

Restatement (Second) of Torts with approval in two defamation cases involving private citizens.[115]

What type of proceeding qualifies for protection can vary from jurisdiction to jurisdiction. Whether the proceeding must be open to the public is another variable.[116] Under either state's formulation of the privilege, the Isikoff Article would not qualify.[117]

In New York, the term "official proceeding" covers any official investigation *even if it is not open to the public*. Although Delaware law concerning what is an "official proceeding" is not fully developed, this Court has stated that an official proceeding means an "accurate reporting of a judicial proceeding or the governmental acts of executive officials of government."[118] We have cited to Section 611 which requires that the proceeding be open to the public, but we have not specifically addressed whether nonpublic FBI or law enforcement proceedings would qualify.

---

This section does not apply to a libel contained in any other matter added any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

N.Y. Civ. Rights Law § 74.

[115] *See Kanaga*, 687 A.2d at 182 n.39; *Read*, 474 A.2d at 120. This Court has also cited to Section 611 of the first Restatement of Torts. *See Short v. News-J. Co.*, 212 A.2d 718, 722 (Del. 1965).

[116] Further, comment d of the Restatement notes that "[i]t is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law." Restatement (Second) Torts § 611 cmt. d.

[117] *See, e.g., Schiavone Constr. Co.*, 847 F.2d at 1073 (holding that Time's report of [the confidential FBI memorandum] was so inherently unfair that it has forfeited the privilege as a matter of law").

[118] *Kanaga*, 687 A.2d at 182.

66

Some states have held that non-public law enforcement reports do not qualify. In *Wynn v. Smith*,[119] for example, the Nevada Supreme Court, applying Nevada law, addressed the fair report privilege in the context of statements attributed to a Scotland Yard document regarding Steve Wynn. Wynn filed a defamation action against a book publisher and its principal based upon statements made in an advertisement for the publisher's unauthorized biography of Wynn. A trade catalogue advertisement on the book stated that the book "details why a confidential Scotland Yard report called Wynn a front man for the Genovese family," when the "Genovese family" is a "reputed organized criminal enterprise."[120]

The Nevada Supreme Court refused to apply the fair report privilege to the statements attributed to the confidential Scotland Yard report. The document was not available to the public and was never recognized by Scotland Yard itself. Moreover, the policies underlying the privilege were never intended to permit statements in such documents to be repeated with impunity, to the detriment of the strong social interest in the protection of private reputations.

In particular the Nevada Supreme Court stated:

> The purpose of this [fair report] exception is to obviate any chilling effect on the reporting of statements already accessible to the public. Here, the Scotland Yard report referenced in the statement at issue was not accessible to the public, nor did Scotland Yard itself ever recognize it as "official." The report was never sent to the British Gaming Control Board, which urged Scotland Yard to compile the report, *and the report was archived for being substandard and unsubstantiated. Inclusion of such a report within the ambit*

---

[119] 16 P.3d 424 (Nev. 2001).

[120] *Id.* at 427.

*of the fair report privilege would directly conflict with the protections provided by our libel laws, and would undermine the basis of the privilege itself. We conclude that this privilege should not be extended to allow the spread of common innuendo that is not afforded the protection accorded to official or judicial proceedings.* Accordingly, we hold that the statement at issue is not subject to the protection afforded by the fair report privilege because the report was not official.[121]

Just as the report in *Wynn* was not accessible to the public, neither was the Dossier at the time of Article's publication.[122] Nor was the source of the FBI's investigation of Page disclosed. And just as the Scotland Yard report was archived for being "substandard and unsubstantiated," the Dossier's sources have since been publicly undermined, and numerous articles that previously reported on it recently have been corrected or

---

[121] *Id*. at 420 (emphasis added). *See also Schiavone*, 847 F.2d at 1087 n.26 (noting that, "we believe that important countervailing policy considerations raise serious issues concerning appropriate application of the privilege to confidential FBI investigation files," and that, "[t]he historical justification of the privilege, which operates as an exception to the general rule that one who republishes a defamation commits libel, is that the report is already in the public domain"). The Third Circuit observed that the New Jersey courts have emphasized the importance of open proceedings to qualify for the protection of the privilege. Reflecting this view, the Third Circuit stated that:

> the [FBI] memorandum was not in the public sphere until [the reporter] unearthed it and Time published it. By publishing such confidential documents about individual citizens, Time brought to light new and potentially defamatory information that the government had no intention of releasing—at least not in the form edited by Time. Such leaks could become powerful tools for injuring citizens with impunity. It is for these reasons that we seriously doubt that the privilege is applicable here.

*Id.*

[122] *See Funk v. Scripps Media, Inc.*, 570 S.W.3d 215, 217–18 (Tenn. 2019) (remanding for a determination as to whether news reports were obtained from an official action or proceeding where, according to the plaintiff, defendants' news reports about the depositions did not fall under the fair report privilege because, at the time the reports were broadcast, the depositions were under seal).

amended.[123]  At the time of the Isikoff Article's publication, an ordinary reader would not have understood that the reports referenced in it (not accessible to them) were not official reports of an official proceeding, but rather, were unsubstantiated statements allegedly fabricated by political opposition researchers.[124]

Page alleges that such obfuscation was the publisher's intent.  He alleges that Isikoff knew that the questionable Dossier was sent to the FBI so that he could "report" on it.  And then, by characterizing the Steele Dossier as an "intelligence report," Oath attempts to bring the Isikoff Article within the ambit of the privilege.  But accepting Page's well-pled allegations as true, the Dossier is not an "official report," and it is reasonably conceivable that Isikoff's characterization of it as such misled its readers that it was.[125]

---

[123] *See* Paul Farhi, *The Washington Post corrects, removes parts of two stories regarding the Steele dossier*, WASH. POST, Nov. 12, 2021 ("The story's headline was amended, sections identifying Millian as the source were removed, [] an accompanying video summarizing the article was eliminated" and "[a]n editor's note explaining the changes was added.  Other stories that made the same assertion were corrected as well."), https://www.washingtonpost.com/lifestyle/style/media-washington-post-steele-dossier/2021/11/12/f7c9b770-43d5-11ec-a88e-2aa4632af69b_story.html.

[124] *Lavin v. New York News, Inc.*, 757 F.2d 1416, 1419 (3d Cir. 1985) ("The privilege extends to an 'accurate, complete, and fair abridgement' of the *official* document.") (emphasis added); *but see id.* ("Conversely, the privilege is abused, and therefore lost, if the account is inaccurate, misleadingly incomplete, or unfair," and "[w]hether abuse of the privilege has been shown is ordinarily a question for the jury, 'unless the facts are such that only one conclusion can reasonably be drawn.'").

[125] In *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304 (S.D. Fla. 2018) plaintiffs filed a defamation suit against BuzzFeed because the plaintiffs' names were associated with allegations that plaintiffs had been involved in Russian efforts to back Democratic Party leaders.  BuzzFeed asserted the fair report privilege as an affirmative defense, among others.  BuzzFeed argued that the Dossier was the subject of "official proceedings," and it subpoenaed several federal government agencies and employees to try to confirm that prior to the publication, the FBI possessed all 35 pages of the Dossier.  Applying New York law, the District Court in Florida held that the fair report privilege was a viable defense for BuzzFeed and granted summary judgment in its favor.  The Florida District Court noted that discovery had "fleshed out the facts" and that review of the fair report privilege as it is codified in New York extends the term "official

Further, courts and respected commentators have distinguished between reports of official government proceedings and reliance on sources from within the government.[126]

As Dean Smolla explains:

> A critical distinction exists between a fair report of a governmental proceeding or report and *sources* within the government, particularly confidential sources, who allegedly provided the reporter with information. In both policy and doctrine a key distinction exists between reports of *official government action* and reports of information provided by official governmental actors. Reporting on what a prosecutor or law enforcement agent testifies to in a courtroom is a report of governmental action. Reporting what the prosecutor or law enforcement officer said to a reporter outside the courtroom during an interview is simply the routine use of a source. The rationale for the fair report privilege, it should be emphasized, is that the reporter acts as the "eyes and ears" of the public in reporting on a proceeding or summarizing a public document. That rationale does not apply, however, when a reporter merely publishes a story based in whole or in part on government sources. If that were the law, the fair report privilege would swallow up a large part of the law of defamation for journalists who constantly publish stories based in whole or in part on leaks from government

proceeding" "to cover any official investigation *even if it is not open to the public*." *Id.* at 1314. Thus, the Florida District Court concluded that the BuzzFeed article reported on an official proceeding, as parts of the Dossier were subject to official action. But notably, in *BuzzFeed, Inc.*, the investigation was of the Dossier itself which had been printed in full without editorializing. The author, Christopher Steele, was identified and the article contained numerous disclaimers. Further, the Florida District Court found that the article was "fair and true" because the article did not editorialize the Dossier, it simply reproduced the Dossier. *Id.* at 1318. Here, by contrast, the source of the FBI's investigation of Page was not disclosed, and as a result, an ordinary reader would not understand that the reports referenced in the Isikoff Article (not accessible to them) were not official reports of an official proceeding, but rather, were unsubstantiated statements allegedly fabricated by political opposition researchers. Moreover, in the *BuzzFeed* litigation, the Florida court was examining whether an official proceeding was underway when BuzzFeed published the article whereas here, Page alleges that Isikoff knew that the questionable Dossier was sent to the FBI so that he could "report" on it. Further, by characterizing the Steele Dossier as an "intelligence report," Oath attempts to bring the Isikoff Article within the ambit of the privilege, but accepting Page's well-pled allegations as true, the Dossier is not an "official report," and it is reasonably conceivable that Isikoff's characterization of it as such mislead its readers that it was.

[126] *See* Rodney A. Smolla, *Rights and Liabilities in Media Content: Internet, Broadcast, and Print* § 6.83 (2d ed. Nov. 2021 Update) (commenting that, "[t]here is a fundamental difference between a fair report of a governmental proceeding and reliance on *sources* within the government").

sources, and it has never been the case that such sourcing in itself privileges the journalist from exposure to liability for defamation.[127]

The case, *Burke v. Sparta Newspapers, Inc.*[128] illustrates the distinction. There, a reporter conducted a non-public one-on-one interview with a police detective who provided additional information that was not available in the public records of plaintiff's arrest or indictment.[129] The reporter relied upon the police detective as his source. The detective also happened to serve as the public information officer for the sheriff's department.

Plaintiff sued the newspaper and the publisher. The newspaper contended that the fair report privilege applied because even though the statements were made in a non-public, one-on-one conversation, the detective, who also worked for the sheriff's department, regularly provided interviews, statements, and releases of information to media outlets in an effort to inform and protect the public.[130]

In rejecting application of the privilege, the Tennessee Supreme Court affirmed the Tennessee Court of Appeal's refusal to extend the privilege to a non-public one-on-one interview between a public official and a journalist. The court concluded that the one-on-one interview was not "a meeting open to the public that deal[t] with a matter of public concern" as required by the Restatement (Second) of Torts Section 611, and therefore the

---

[127] Smolla, *supra* note 12, § 8.67 (2d ed. Nov. 2021 Update) (footnote omitted).

[128] 2018 WL 3530839 (Tenn. Ct. App. July 23, 2018), *aff'd*, 592 S.W.3d 116 (Tenn. 2019).

[129] The additional information included the following: plaintiff's role as an intermediary in a business transaction; whether a certain product ordered through the plaintiff was ever delivered; and whether the seller of the product ever received funds from the plaintiff. *Burke*, 2018 WL 3530839, at *6.

[130] *Burke*, 592 S.W.3d at 119.

privilege would only apply if the interview constituted "an official action or proceeding."[131] The Tennessee Supreme Court interpreted "official actions or proceedings" as encompassing "only *public* proceedings or official actions of government that have been made *public*."[132] Because a private one-on-one interview provided no objective means for one to determine the fairness and accuracy of the statements, the court held that the fair report privilege did not apply. The court described the rationale for the privilege as "the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings."[133] It concluded that "expanding the fair report privilege to nonpublic, one-on-one conversations would constitute a departure both from the rationale on which the privilege is based and from existing Tennessee law defining its scope and that such an expansion would unnecessarily complicate the task of determining whether a report should be protected by the privilege."[134]

---

[131] *Id.* at 122.

[132] *Id.* at 123.

[133] *Id*. at 121 (citing Restatement (Second) of Torts § 611 cmt. a (1977)).

[134] *Id*. at 124. *See also Butcher v. Univ. of Massachusetts*, 136 N.E.3d 719 (Mass. 2019) (The Supreme Judicial Court of Massachusetts held that even though police blotters are public in nature does not mean that "all statements of any type contained in a police blotter" would be privileged. Further, some commentators noted that "extending the privilege would create a risk that blotters could become 'a tempting device for the unscrupulous defamer' who could report, anonymously, scandalous accusations, knowing they could be 'given wide currency in the tabloids and newspapers.'"); *see also Alharbi v. Theblaze, Inc.*, 199 F.Supp.3d 334, 352 (D. Mass. 2016) (holding that defendants did not meet their burden to demonstrate that the alleged defamatory statements were reporting on "official" government actions and observing that "an anonymous statement is not an official one," . . . "[t]he defendants have provided no evidence of what official acct or proceeding the confidential sources based their reports on") (citations and quotations omitted).

In this case, the Isikoff Article's sources for the referenced "reports" and "intelligence reports" about which he complains are all unnamed, anonymous sources. For example, the Article states that "U.S. officials have since received intelligence reports that . . . Page met with Igor Sechin . . . a well-placed Western intelligence source tells Yahoo News."[135] No specific official statement or proceeding is even identified from which the statements are derived. That alone is a disqualifying factor.[136] Moreover, the alleged defamatory statements are not derived from an official government action or proceeding, or even a government source, but rather, from the Steele Dossier. Page argues that the use of the phrase "western intelligence source" is an attempt to bring the Article within the ambit of the privilege by giving the statements the imprimatur of some official action. However, that attempt should fail because the Dossier is not an official statement or action as readers had no objective means of determining the fairness and accuracy of its statements.[137]

---

[135] A80 (Isikoff Article).

[136] *See, e.g. Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270 (Tenn. Ct. App. 2007) (distinguishing between information the police chief made available through official action, *i.e.*, a press conference, and information the news channel obtained via its own investigation outside of any official action and holding that the later information "[did] not reflect official agency action and [did] not have sufficient authoritative weight" to fall within the fair report privilege); *Wynn v. Associated Press*, 136 Nev. 611 (Nev. 2020) (holding that the police department's press conference and publicly released email did not bring the Associated Press article within the privilege "because neither the press conference nor the email addressed the substance of the allegations that were described in the article"); *Tharp v. Media General, Inc.*, 987 F.Supp.2d 673, 685–86 (D.S.C. 2013) (holding the fair report privilege is inapplicable where the disputed publications published information based upon their "own investigation and interviews, rather than a government report or action").

[137] *See, e.g., Lewis*, 238 S.W.3d at 285 (stating that the fair report privilege allows "the media and others to be the eyes and ears of the members of the public who would have been able to witness the proceedings or obtain the information had they be present to see or hear for themselves").

Page further argues that Isikoff embellished the story by making up details about the "alleged meeting" including that "Sechin raised the issue of the lifting of sanctions with Page."[138] Adding editorialized statements and going beyond reporting on the official statements or proceedings (although none are specifically identified) also disqualifies Oath from relying on the privilege.[139]

Further, to be protected, the report must also be fair.[140] The Isikoff Article, Page adequately alleges, was not. Page alleges a collusive scheme which precludes application of the privilege at this stage of the proceedings. Comment c to Section 611 of the Restatement embodies this principle and supports Page's view:

---

[138] A22 (Compl. ¶ 29). *See, e.g., Schiavone*, 847 F.2d at 1089 ("A report that intentionally excludes information that is as obviously exculpatory as the information [the author] elected to delete simply cannot, under any definition, be deemed either fair or accurate."). At the very least, whether Delaware's fair report privilege applies raises a fact issue precluding dismissal at this stage. Earlier in the *Schiavone* proceedings, the Third Circuit reverses the District Court's dismissal of the case and held that the complaint raised a factual question as to the fairness of the report. *See Schiavone Constr. Co. v. Time, Inc.*, 735 F.2d 94 (3d Cir. 1984); Smolla*, supra* note 12, § 8:60 (Generally, "the question of whether the privilege has been abused is a question of fact for the jury.").

[139] In *BuzzFeed*, for example, the United States District Court for the District of Florida concluded that BuzzFeed did not editorialize or restate the Dossier; it simply published it." *Gubarev*, 304 F.Supp.3d at 1371. That court distinguished cases where "the allegedly defamatory statements summarized, restated and editorialized upon official proceedings." *Id*.; *see also Weber v. Lancaster Newspapers*, 878 A.2d 63, 72 (Pa. Super Ct. 2005) (observing that the fair report privilege can be forfeited if the report on the official action is exaggerated or embellished).

[140] *See, e.g., Schiavone*, 847 F.2d at 1073 (Under New Jersey law, magazine forfeited any qualified fair report privilege that might have applied by omitting exculpatory material contained in a confidential FBI report leaked to the magazine from the article and also expressing "grave doubts that New Jersey would apply its fair report privilege to an unauthorized leak of an internal FBI memorandum.").

A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not. Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him.[141]

The comment suggests that a reporter cannot take advantage of the fair report privilege by trying to use it as a "loophole" to protect himself from his own original defamatory publications. As mentioned by the Third Circuit in *Schiavone*,[142] this type of information -- leaked information not yet primed for public consumption -- is what the court was concerned about. *ZS Assocs. v. Synygy, Inc.*[143] illustrates the point. There, the United States District Court for the Eastern District of Pennsylvania found the fair report privilege inapplicable. The plaintiff filed a complaint, and then issued a press release describing the complaint in some detail and republishing the statements. The court reasoned that Restatement (Second) of Torts § 611 "prevents a plaintiff from filing a lawsuit containing defamatory allegations and then 'reporting' such defamatory allegations

---

[141] Restatement (Second) of Torts § 611 cmt. c. (1977); *see also* Smolla, *supra* note 12, § 8:76 ("So too, a reporter who acts in collusion with a party to a proceeding, or who presents material under the pretense of a fair report when it is in actuality a sham effort to put forward one side's party line, is deservedly ousted from the protection of the privilege.").

[142] *See Schiavone*, 847 F.2d at 1087 n.26.

[143] 2011 WL 2038513 (E.D. Pa. May 23, 2011); *see also Funk*, 570 S.W.3d at 216–17 (observing that the prospect that "reporters with vendettas may solicit or goad others into making defamatory statements in official proceedings and then repeat the defamatory statements to the public" would be a "cause for concern," and concluding that "in such unusual circumstances, it is unlikely that the fair report privilege would apply") (citing Restatement (Second) of Torts, § 611 cmt. c.).

with impunity."[144]  Further, courts have observed that, "[t]his provision prevents journalists from using the privilege as a sword rather than a shield."[145]

In sum, I believe it was error to conclude the fair report privilege applies as a matter of law and that it can serve as a basis for dismissal of the claims relating to the Isikoff Article.

## D. Conclusion

As a result of the publications at issue here, and primarily the Isikoff Article, Page claims total damage to his economic and reputational interests and near total destruction of his life as he knew it.[146]

---

[144] *ZS Assocs.*, 2011 WL 203851, at *4 (footnote omitted); *see also id*. at *14 ("The privilege was not 'intended to permit a person maliciously to institute a judicial proceeding, alleging false and defamatory charges, then to circulate a press release or other communication based thereon, and, ultimately to escape liability by invoking the fair report privilege statute.'").

[145] *Funk*, 570 S.W.3d at 217; *see also American Addiction Centers, Inc. v. National Ass'n of Addiction Treatment Providers*, 515 F.Supp.3d at 846 (citing the Restatement (Second) of Torts § 611 cmt c. and rejecting defendant's attempt to "confer the fair report privilege upon itself based upon its making the original defamatory statements itself and their reporting those statements to others").

[146] *See* A59 (Compl. ¶ 118) ("Defendant's defamatory statements injured Dr. Page's reputation."); A60 (Compl. ¶ 121) ("Defendant's defamatory statements caused Dr. Page and the Companies [GEC and GNGV] to lose many business opportunities."); A60 (Compl. ¶ 122) ("When Dr. Page was falsely accused of being a traitor to his country and an agent of Russia, such reputational harm was equally imputed to the Companies' [GEC and GNGV] reputation."); A61–62 (Compl. ¶ 125) ("As a direct result of the harm to Dr. Page's reputation caused by the 2016 Yahoo Article and the other false and defamatory articles published by Defendant and/or its subsidiaries and/or divisions, the Companies [GEC and GNGV] suffered, and will continue to suffer, actual injury.  At least three banks and diversified financial services companies have declined to do business with Dr. Page and the Companies [GEC and GNGV] because of the defamatory statements published by the Defendant.  The defamatory statements have also cost Plaintiff numerous other clients and business opportunities."); A62 (Compl. ¶ 126) ("Dr. Page also began receiving countless death threats after Defendant published the defamatory statements."); A62 (Compl. ¶ 127) ("Dr. Page did not receive death threats before the defamatory statements were published.  Since Oath thrust Dr. Page into the public light on a global basis with its defamatory publications targeting him, he

The Supreme Court has recognized that, "[w]e have not gone so far . . . as to accord the press absolute immunity in its coverage of public figures or elections."[147] "If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail."[148] In reversing the grant of summary judgment in favor of the newspaper defendants and holding that the issues presented were questions for a jury, this Court's comments in *Kanaga* bear mention here:

> The defining issue in most libel actions is whether the First Amendment rights of the defendants will permit defamatory material to be considered by the jury. We are mindful of the fundamental importance of those constitutional protections to our freedom of expression and the important role of a free media in our society. But, as the opinion of Chief Justice Rehnquist for the majority in *Milkovich* noted in quoting Justice Potter Stewart in his concurring opinion in *Rosenblatt v. Baer*: The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.[149]

Here we are not talking about a plaintiff's ultimate victory and prevailing in the case. Just as the plaintiffs in the *New York Times* and *Harte-Hanks* cases were able to get their cases in front of a jury, Page should at least be entitled to proceed to the discovery

---

suffered public humiliation and threats of the same scale."); A62–63 (Compl. ¶ 128) ("Because of these death threats, Dr. Page could no longer walk public streets without reasonably and legitimately fearing for his safety. Thus, Dr. Page has been required to avoid being in public or in crowds as much as physically possible."); A63 (Compl. ¶ 129) ("[T]he 2016 Yahoo Article and other articles containing false and defamatory statements about Dr. Page published by Defendant and/or its subsidiaries have completely devastated the life Dr. Page had built for himself over four decades.").

[147] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 688.

[148] *Id.*

[149] *Kanaga*, 687 A.2d at 183 (footnote omitted) (citing *Milkovich*, 497 U.S. at 22–23); *see Rosenblatt*, 383 U.S. at 92–93 (Stewart, J., concurring).

phase on the part of his Complaint pertaining to the Isikoff Article.[150] I believe that depriving him of that opportunity and, instead, affirming the dismissal of his Complaint results in an injustice to Page.

For these reasons, I respectfully dissent.

---

[150] *See Milkovich*, 497 U.S. at 7 (allowing the defamation action to proceed through discovery to trial); *Herbert*, 441 U.S. at 176 (requiring discovery into the editorial process in order to allow the libel plaintiff an opportunity to meet the difficult burden set forth in *New York Times v. Sullivan*); *Gubarev*, 340 F. Supp. 3d at 1312 (allowing discovery in order to determine whether New York's report privilege applied); *Price v. Viking Press, Inc.*, 113 F.R.D. 585, 588 (D. Minn. 1986) (permitting plaintiff to discover background facts closely related to the subject matter of the alleged defamation instead of limiting plaintiff's discovery to specific alleged defamatory statements).